**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Donald TEAGUE, Defendant–Appellant.**

**No. 89–8181.**

United States Court of Appeals,
Eleventh Circuit.

Feb. 26, 1992.

William A. Morrison, Jones, Morrison & Womack, P.C., Atlanta, Ga., for defendant-appellant.

Gerrilyn Brill, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before TJOFLAT, Chief Judge, FAY, KRAVITCH, HATCHETT, ANDERSON, EDMONDSON, COX, BIRCH and DUBINA, Circuit Judges,* and CLARK **, Senior Circuit Judge.

FAY, Circuit Judge:

Defendant Donald Teague was convicted of attempting to possess marijuana with intent to distribute, 21 U.S.C. §§ 841(a)(1) and 846, and carrying a firearm during a drug trafficking crime, 18 U.S.C. § 924(c). He appealed the district court's denial of his motion for a new trial, arguing that he was denied his constitutional right to testify because his counsel did not call him as a witness at his trial. A divided panel of this court agreed that Teague's right to testify had been violated, and reversed. *United States v. Teague*, 908 F.2d 752 (11th Cir. 1990). A majority of the judges of this court in regular active service voted that this case be reheard by this court en banc. *United States v. Teague*, 932 F.2d 899 (11th Cir.1991) (on petition for rehearing and suggestion for rehearing en banc).[1] On rehearing, we AFFIRM the judgment of the district court.

## BACKGROUND

The record indicates that in August 1988, Donald Augustine, an undercover Drug Enforcement Administration (DEA) agent, arranged to sell seventy-five pounds of mari-

---

* Senior U.S. Circuit Judge Johnson, who was a member of the *en banc* court which heard oral argument in this case, took senior status Oct. 30, 1991, and therefore did not participate in this decision.

** Senior U.S. Circuit Judge Thomas A. Clark has elected to participate in this decision pursuant to 28 U.S.C. § 46(c).

1. This order vacated the previous panel's opinion. *United States v. Teague*, 932 F.2d 899 (11th Cir.1991).

juana to Kenneth Patterson. Patterson was to make an initial payment of $35,000 and a final payment of $17,500 a few days later.

At that time, Donald Teague was working for Patterson on the renovation of Patterson's mother's home in Atlanta. On the morning of August 17, 1988, Patterson and Teague made several trips together away from the house. On the first trip, they went to a hardware store and then bought beer at a bait shop. They later made a second trip to the bait shop to buy ice. After returning from the second trip, Patterson asked Teague to accompany him on a third trip, and the two drove off in Patterson's truck. When Teague asked where they were going, Patterson said they were going "to check out some herbal."

Patterson and Teague drove to the restaurant parking lot where Patterson had agreed to meet with Augustine. Patterson got out of the truck and spoke with Augustine while Teague remained in the truck. When Augustine asked who Teague was, Patterson identified him as his partner. Patterson then got back in the cab of the truck, while Augustine remained outside and talked to the two men through the driver's side window. Augustine asked Teague whether he was Patterson's partner, and Teague responded affirmatively. Augustine also expressed some concern about Patterson's ability to obtain the additional $17,500 in a few days. Teague then told Augustine not to worry, that Patterson was trustworthy.

When Augustine asked to see the money Patterson had agreed to bring, Patterson opened a bag and handed him envelopes containing money. Augustine testified that when Patterson opened the bag to remove the envelopes he also removed a handgun from the bag and put it on the seat between himself and Teague. However, according to Patterson, who testified

for the defense, Patterson had removed the handgun from the bag and placed it on the seat before they entered the parking lot. Augustine then invited Patterson to accompany him to his car to inspect the marijuana. Augustine further testified that Patterson and Teague discussed how they would transfer the marijuana from Augustine's car to the truck. Patterson got out of the truck to follow Augustine to his car, leaving the handgun on the seat. Augustine then gave a signal, and Patterson and Teague were arrested.

A federal grand jury indicted Patterson and Teague on charges of conspiring to possess marijuana with intent to distribute, 21 U.S.C. §§ 841(a)(1) and 846, attempting to possess marijuana with intent to distribute, *id.*, and carrying a firearm during the commission of a drug trafficking crime, 18 U.S.C. § 924(c).[2] Patterson entered into a plea agreement, but Teague proceeded to trial, represented by Stephanie Kearns, Director of the Federal Public Defender Program for the Northern District of Georgia. On November 28, 1988, after a two-day trial, a jury convicted Teague of the attempt to possess marijuana with intent to distribute and the firearm charges, but acquitted him of the conspiracy charge.

Then on December 2, 1988, Teague filed a motion for new trial, claiming that he had been denied his constitutional right to testify at trial on his own behalf. The district court held an evidentiary hearing on this motion on February 3, 1989.

At the evidentiary hearing, Teague's counsel testified that Teague had made his desire to testify known to her prior to trial. For that reason, she conducted a mock direct and cross-examination with Teague in her office during the week before trial. Counsel testified that it was part of her normal practice to discuss with her clients whether they would testify and that she probably explained to Teague at this time

---

**2.** 18 U.S.C. § 924(c) provides in pertinent part:

(c)(1) Whoever, during and in relation to any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug

trafficking crime, be sentenced to imprisonment for five years....

(2) For purposes of this subsection, the term "drug trafficking crime" means any felony punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.)....

that whether he would testify ultimately would be his decision. According to counsel, Teague had difficulty maintaining his composure during the practice; he cried while she was asking him questions and would frequently rush to answer before she finished the question. Counsel then advised Teague that in her opinion it would be better if he did not testify. Although she felt the jury would perceive him as "truthful, open, and very sincere," she was afraid that he would not listen carefully to the questions being asked and therefore easily could be manipulated by the prosecution on cross-examination. However, no final decision on whether Teague would testify was reached at that time. Counsel testified that they intentionally left the question open until it was clear if Patterson would be testifying in Teague's defense. She felt that if Patterson testified there would be little reason for Teague to testify.

During the trial, Teague several times asked counsel when he would be testifying. At that point, because it was clear that Patterson would be testifying for the defense, she told Teague to wait and see what Patterson said. Patterson testified that Teague was not involved in the deal and that he did not tell Teague about the quantity of "herbal" or the amount of money involved. According to Patterson, he wanted Teague to accompany him as protection and he told Augustine that Teague was his partner only because he was afraid Augustine would back out if he knew that someone who was not involved in the deal was present. Patterson further testified that other than saying that Patterson was good for the money Teague did not speak to Augustine. However, Patterson also testified that he took his gun out of the bag and put it on the seat between them long before they arrived at the parking lot, so Teague must have been aware of it. Teague was very concerned about this last

testimony, pulling on counsel's sleeve and whispering, "That's not true," and asking when he was going to have a chance to tell his side of the story. At that time, counsel did not think the conflicting testimony about the gun was significant, and told Teague not to worry about it. The defense rested after Patterson testified, without the testimony of Teague.

At some point after the defense rested but before closing arguments, Teague again asked when he would testify, and counsel again discussed it with him.[3] During that conversation, she felt that Teague was just letting her know that he was willing to testify, if necessary. According to counsel, Teague was concerned about Patterson's testimony about the gun. Counsel testified that she told him that it was not necessary for him to testify because agent Augustine had contradicted Patterson's testimony about the gun. Teague did not persist, and counsel testified that at the time she rested the defense case, she felt that Teague had assented to the decision not to put him on the stand. No motion was made to reopen the defense case to permit Teague to testify.

Closing arguments were made the next day, and the jury retired to deliberate, ultimately acquitting Teague of conspiracy, but convicting him of attempt to possess marijuana with intent to distribute and carrying a firearm during a drug trafficking crime. Sometime after this verdict was rendered, however, Teague began to call his counsel at home late at night. He was very distressed and repeatedly asked her when he would get a chance to tell his side of the story. Counsel then became very concerned that she may not have made it clear to Teague that the choice of whether to testify belonged to him, not her, and for that reason she filed the motion for new trial.[4]

---

**3.** Counsel testified initially that this conversation was at the end of the defense case, but later said that it very possibly could have been after the defense rested. The district court found that this conversation occurred after the defense rested.

**4.** In that motion, Ms. Kearns requested that other counsel be appointed to represent Teague on the motion for new trial. The court then appointed William Morrison to represent Teague.

Teague also testified at the evidentiary hearing on his motion for new trial. He remembered discussing with counsel whether he would testify, and that she advised him not to testify, although he could not remember if she told him the reason why. He also testified that counsel never told him that she would not allow him to testify.

Then, at the court's request, Teague gave his version of what happened, *i.e.,* what he would have testified to had he been called to the stand. Teague testified that he thought that the third time he and Patterson went out it was to buy a drill bit that Teague needed. When Teague got in the truck, Patterson told him that he needed to stop to "check on some herbal." They pulled into the restaurant parking lot and the agent asked Patterson if he had the money. Patterson responded affirmatively, handed the agent the bag for the agent to count it, and the agent said, "The stuff is in the car." Teague testified that marijuana was never mentioned, and that although he knew Patterson smoked marijuana, he did not know what Patterson meant by "herbal." Teague further testified that when the agent asked Patterson if Teague was his partner, Teague just nodded his head "like hello" and never said anything. Patterson then took the gun out of the bag and put it on the seat, got out of the truck, and walked about half way across the parking lot where he was arrested.

After the evidentiary hearing, the district court issued a detailed order denying Teague's motion for new trial. The court found that "the evidence fail[ed] to show that the Defendant's will was 'overborne' by his counsel. The Defendant was advised of his right to testify, was advised that he should not exercise that right, and did not protest." [5] The court therefore found no violation of Teague's right to testify. The district court also noted that although "trial counsel does have some genuine reservations at this point concerning the advice

she gave to her client ... that does not persuade the court that counsel's decision was ineffective" because the reasons she gave for advising him not to testify were good, "especially when the advice was given following careful assessment of the client as a potential witness." The district court also found that "the evidence adduced at the hearing failed to show that Teague was prejudiced by failing to testify" because much of his testimony would have duplicated that of Patterson or the DEA agent, and at best "would have assisted him in proving what he did not know in advance, not once he arrived on the scene." As Teague was acquitted of the conspiracy charge, but convicted of the attempt and firearms charges, the court reasoned that this evidence would not have greatly aided his defense.

## DISCUSSION

Teague challenges both his convictions and the denial of his motion for new trial. First, Teague argues that the evidence was insufficient to support convictions for attempted possession of marijuana with intent to distribute and for use of a firearm during the commission of a drug trafficking crime. Further, Teague argues that the district court should have granted his motion for new trial because his right to testify was violated when counsel rested the defense case without calling him as a witness, despite his repeated requests to testify.

### *Sufficiency of the Evidence*

■ Teague argues that the evidence presented at trial was insufficient to convict him either of attempt to possess marijuana with intent to distribute or of use of a firearm during a drug trafficking crime. The original panel of this court reviewed the evidence presented on both of these charges and found it sufficient to support the jury's verdict. *United States v. Teague,* 908 F.2d 752, 756 (11th Cir.1990). We

---

5. The district court also stated that "[w]hile there was no specific evidence adduced on this point, the court is confident that Ms. Kearns, a very experienced criminal defense attorney ...

knew that the court would likely grant a motion to reopen prior to beginning of the arguments of counsel."

agree, and reinstate the discussion of this claim in the original panel opinion as the opinion of this court.

### Right to Testify

■ Teague also argues that his attorney deprived him of his constitutional right to testify in his own behalf when she rested the defense case without calling him to the stand, despite his repeated indications that he wanted to testify. The government responds that Teague waived his right to testify either because he did not affirmatively assert that right during his trial or because he knew of his right to testify yet acquiesced in his attorney's decision not to call him as a witness.

It is clear that a criminal defendant has a constitutional right to testify in his own behalf at his trial. Although historically criminal defendants were prohibited from testifying because of their interest in the outcome of the trial, that view has long since been abandoned.[6] Indeed, the United States Supreme Court has recognized that there is "no rational justification for prohibiting the sworn testimony of the accused, who above all others may be in a position to meet the prosecution's case," *Ferguson v. Georgia*, 365 U.S. 570, 582, 81 S.Ct. 756, 763, 5 L.Ed.2d 783 (1961), and that "[i]t is now accepted ... that an accused has a right ... to testify on his own behalf." *Faretta v. California*, 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 2533 n. 15, 45 L.Ed.2d 562 (1975).

The constitutional stature of this right was expressly recognized by the Supreme Court in *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). In *Rock*, the Court considered whether "a criminal defendant's right to testify may be restricted by a state rule that excludes her posthypnosis testimony." *Id.* at 53, 107 S.Ct. at 2709. As a preliminary matter, the Court discussed the development of the right to testify. Although the right to testify is not explicitly stated in the Consti-

tution, the Supreme Court noted that it "has sources in several provisions of the Constitution." *Id.* at 51, 107 S.Ct. at 2708. The Court first cited the due process clause of the Fourteenth Amendment, stating that "the right to be heard, which is so essential to due process in an adversary system of adjudication, [can] be vindicated only by affording a defendant an opportunity to testify before the factfinder." *Id.* at 51 n. 8, 107 S.Ct. at 2709 n. 8. The Court also cited to Justice Clark's concurring opinion in *Ferguson v. Georgia* for the proposition that the Fourteenth Amendment secures the "right of a criminal defendant to choose between silence and testifying in his own behalf." 365 U.S. at 602, 81 S.Ct. at 773 (Clark, J., concurring). Next, the Court found support in the compulsory process clause of the Sixth Amendment, stating that "[l]ogically included in the accused's right to call witnesses whose testimony is 'material and favorable to his defense,' is a right to testify himself, should he decide it is in his favor to do so." *Rock*, 483 U.S. at 52, 107 S.Ct. at 2709 (citation omitted). Moreover, the Court recognized that under *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Sixth Amendment includes the right of self-representation, and that "[a] defendant's opportunity to conduct his own defense by calling witnesses is incomplete if he may not present himself as a witness." *Rock*, 483 U.S. at 52, 107 S.Ct. at 2709. Lastly, the Court found that the right to testify "is also a necessary corollary to the Fifth Amendment's guarantee against compelled testimony." *Id.* With this discussion, the Court put to rest any doubt that a criminal defendant has a *constitutional* right to testify in his own defense.

However, this right is not unlimited. For example, the right to testify clearly does not include the right to commit perjury. *See Nix v. Whiteside*, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). Neverthe-

---

**6.** For an historical overview of the recognition of the right to testify, see generally Timothy P. O'Neill, *Vindicating the Defendant's Constitutional Right to Testify at Criminal Trial: The Need for An On-the-Record Waiver*, 51 U.Pitt. L.Rev. 809 (1990); Seth Dawson, Comment, *Due Process v. Defense Counsel's Unilateral Waiver of the Defendant's Right to Testify*, 3 Hastings Const.L.Q. 517 (1976).

less, as the Supreme Court stated in *Rock,* "restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve." 483 U.S. at 55–56, 107 S.Ct. at 2711–12; *cf. Chambers v. Mississippi,* 410 U.S. 284, 295, 302, 93 S.Ct. 1038, 1045, 1049, 35 L.Ed.2d 297 (1973) (The defendant's right to present witnesses in his own defense is subject to other legitimate interests in the criminal trial process such as the established rules of evidence and procedure.)

In the case at bar, however, Teague claims that he was prevented from testifying, not by the government or the court, but by his own lawyer. We are thus called upon to determine whether defense counsel is empowered to waive defendant's right to testify.

Criminal defendants possess essentially two categories of constitutional rights: those which are waivable by defense counsel on the defendant's behalf, and those which are considered "fundamental" and personal to defendant, waivable only by the defendant. Generally included in the former are matters which primarily involve trial strategy and tactics. *See Henry v. Mississippi,* 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965). Examples of such matters are what evidence should be introduced, what stipulations should be made, what objections should be raised, and what pre-trial motions should be filed. *See 1 Standards for Criminal Justice,* Standard 4–5.2 comment (2d ed. 1980). Examples of fundamental decisions which only the defendant is empowered to waive are entry of a guilty plea, *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), waiver of a jury trial, *Adams v. United States ex rel. McCann,* 317 U.S. 269, 277–78, 63 S.Ct. 236, 240–41, 87 L.Ed. 268 (1942), and whether to pursue an appeal, *see Fay v. Noia,* 372 U.S. 391, 439, 83 S.Ct. 822, 848, 9 L.Ed.2d 837 (1963).

In *Rock,* the Supreme Court did not need to decide whether the constitutional right to testify was fundamental in character, and therefore personal to the defendant, or whether it could be waived by the defense

attorney. However, the Court in *Rock* emphasized that the right to testify "is one of the rights that 'are essential to due process of law in a fair adversary process,'" 483 U.S. at 51, 107 S.Ct. at 2708 (quoting *Faretta,* 422 U.S. at 819 n. 15, 95 S.Ct. at 2533 n. 15), and that it is "[e]ven more fundamental to a personal defense than the right of self-representation," *id.* at 52, 107 S.Ct. at 2709. Moreover, the Court noted that it has "[o]n numerous occasions ... proceeded on the premise that the right to testify on one's own behalf in defense to a criminal charge is a *fundamental constitutional right.*" *Id.* at 53 n. 10, 107 S.Ct. at 2710 n. 10 (emphasis added). Perhaps the most telling of these occasions cited by the Court is *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983), in which the Court stated in dicta that "the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, *testify in his or her own behalf,* or take an appeal." (Emphasis added.) Thus, in *Rock,* the Supreme Court has clearly and strongly indicated that the constitutional right to testify should be treated as fundamental.

Although the Supreme Court has not expressly addressed this question, this is not the first time it has come before this court. In *Wright v. Estelle,* 572 F.2d 1071 (5th Cir.) (en banc), *cert. denied,* 439 U.S. 1004, 99 S.Ct. 617, 58 L.Ed.2d 680 (1978), the former Fifth Circuit was presented with the issue of whether a defendant has a fundamental right to testify. During Wright's trial, a conflict arose between Wright and his court-appointed counsel about whether Wright would testify in his own defense. The lead defense counsel told Wright that he would no longer represent him if Wright elected to testify. The plurality affirmed the panel opinion which assumed without deciding that there was a constitutional and fundamental right to testify, but found that in that case the error was harmless because the evidence was overwhelming. *Wright v. Estelle,* 549 F.2d 971 (5th Cir.1977) (panel opinion). Judges Thornberry, Clark, Roney, Gee, and Hill filed a special concurrence, arguing that

the decision regarding whether the defendant will testify is essentially strategic and best delegated to defense counsel:

> The scope of the delegation does not turn on the importance of the decision—the attorney frequently makes judgments affecting the very life of the defendant. The question here is twofold: who is in a better position to judge trial strategy and who is in a better position to ensure the best interests of the defendant.

*Wright,* 572 F.2d at 1073 (Thornberry, Clark, Roney, Gee, & Hill, JJ., specially concurring). The concurrence distinguished the decision on whether to plead guilty or not guilty from the decision on whether to testify, stating that the decision on what to plead "goes to the very existence of a trial. To deny the defendant control over this decision could be tantamount to denying the defendant a trial. Here, of course, there is a trial and the decision made by the attorney goes merely to strategy." *Id.* at 1073 n. 3.

Judge Godbold, joined by Judges Goldberg and Tjoflat, filed an eloquent dissent arguing that the right to testify is a fundamental constitutional right that cannot be waived by defense counsel.

> In making the choice on whether to testify, just as the choice on whether to represent himself, the defendant elects whether to become an active participant in the proceeding that affects his life and liberty and to inject his own action, voice and personality into the process to the extent the system permits.
>
> ....
>
> ... To deny a defendant the right to tell his story from the stand dehumanizes the administration of justice. I cannot accept a decision that allows a jury to condemn to death or imprisonment a defendant who desires to speak, without ever having heard the sound of his voice.

*Id.* at 1078 (Godbold, J., dissenting).

More recently, this question was addressed by a panel of this court in *United States v. Scott,* 909 F.2d 488 (11th Cir.1990) (Fay and Johnson, Circuit Judges, and Gibson, Senior Circuit Judge for the Eighth Circuit sitting by designation). During Scott's trial, defense counsel moved to withdraw from the case but would not give the reasons for this request to the trial court. The court assumed that this was because Scott desired to testify but the attorney intended to keep him off the stand. Rather than ruling on this motion, the court gave Scott a choice: either proceed with counsel, but relinquish the right to testify, or proceed pro se. This court reviewed the development of the right to testify and concluded that it was now a recognized fundamental constitutional right, personal to the defendant, which cannot be waived by defense counsel. This court then found that the trial judge had improperly forced the defendant to choose between two constitutional rights, the right to counsel and the right to testify, and therefore vacated defendant's conviction and remanded for a new trial.

 We now reaffirm that a criminal defendant has a *fundamental* constitutional right to testify in his or her own behalf at trial. This right is personal to the defendant and cannot be waived either by the trial court or by defense counsel.

Under the Supreme Court's reasoning in *Rock,* the right to testify essentially guarantees the right to ultimately *choose* whether or not to testify. The Supreme Court stated that the right to testify is "a necessary corollary to the Fifth Amendment's guarantee against compelled testimony." *Rock,* 483 U.S. at 52, 107 S.Ct. at 2709. The Court then quoted from *Harris v. New York,* 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971): "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so." A criminal defendant clearly cannot be compelled to testify by defense counsel who believes it would be in the defendant's best interest to take the stand. It is only logical, as the Supreme Court has recognized, that the reverse also be true: A criminal defendant cannot be compelled to remain silent by defense counsel.

 The decision whether a criminal defendant should take the witness stand in his own trial unquestionably has tremendous strategic importance. Nevertheless,

the mere fact that such a decision involves trial strategy does not itself mandate that the decision ultimately rest with defense counsel.[7] Nor does our conclusion place the right to testify in conflict with the right to counsel. Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide.[8] This advice is crucial because there can be no effective waiver of a fundamental constitutional right unless there is an "intentional relinquishment or abandonment of a *known* right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (emphasis added). Moreover, if counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify.[9] The defendant can then make the choice of whether to take the stand with the advice of competent counsel.

█ It is important to remember that while defense counsel serves as an advocate for the client, it is the client who is the master of his or her own defense. *See Mulligan v. Kemp*, 771 F.2d 1436, 1441 (11th Cir.1985) (Trial counsel "is still only an *assistant* to the defendant and not the master of the defense."), *cert. denied*, 480 U.S. 911, 107 S.Ct. 1358, 94 L.Ed.2d 529 (1987); Model Rules of Professional Conduct rule 1.2 & comment. When an individual stands accused of criminal conduct, the choice to tell his side of the story has

ramifications far beyond the more immediate goal of obtaining an acquittal. It is, after all, the *defendant's* day in court. The decision to take the stand in his own defense, like the decision to plead not-guilty and proceed to trial, provides the defendant with an opportunity directly to meet the charges against him. "The wisdom or unwisdom of the defendant's choice does not diminish his right to make it." *Wright*, 572 F.2d at 1079 (Godbold, J., dissenting). By exercising his constitutional right to the *assistance* of counsel, a defendant does not relinquish his right to set the parameters of that representation. Any other conclusion would be "to imprison a man in his privileges and call it the Constitution." *Adams*, 317 U.S. at 280, 63 S.Ct. at 242.

We also note that our conclusion is consistent with the generally accepted practice within the bar. For example, the American Bar Association's Standards for Criminal Justice provide:

> (a) Certain decisions relating to the conduct of the case are ultimately for the accused and others are ultimately for defense counsel. The decisions which are to be made by the accused after full consultation with counsel are:
>
> (i) what plea to enter;
>
> (ii) whether to waive jury trial; and
>
> (iii) *whether to testify in his or her own behalf.*

1 *Standards for Criminal Justice* Standard 4–5.2(a) (2d ed. 1980) (emphasis added).[10] The commentary to this provision

---

7. If that were true, the decision to waive a jury trial would logically also rest with defense counsel, as it involves defense strategy at least as much as the decision whether the defendant will testify. However, the Supreme Court has clearly stated that the right to a jury trial in a criminal case cannot be waived by defense counsel. *Adams v. United States ex rel. McCann*, 317 U.S. 269, 277–78, 63 S.Ct. 236, 240–41, 87 L.Ed. 268 (1942).

8. We believe that it would be inappropriate to require the trial court to discuss this choice with the defendant. Such a requirement would unnecessarily intrude into the attorney-client relationship and could unintentionally influence the defendant in his or her choice. *See United*

*States v. Wagner*, 834 F.2d 1474, 1483 (9th Cir. 1987).

9. There are good tactical reasons why it may not be best for the defendant to testify in some circumstances. Some examples might be if the defendant might provide evidence of missing elements of the crime on cross-examination, if the defendant might be prejudiced by revelation of prior convictions, or if the prosecutor might impeach the defendant using a prior inconsistent statement.

10. In *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) (citation omitted), the Supreme Court noted that "[p]revailing norms of practice as reflected in American Bar Association standards and the

states that "because of the fundamental nature of these three decisions, so crucial to the accused's fate, the accused must make the decisions." *Id.* commentary. Further, Rule 1.2(a) of the American Bar Association's Model Rules of Professional Conduct states that:

> (a) A lawyer shall abide by a client's decisions concerning the objectives of representation ... and shall consult with the client as to the means by which they are to be pursued.... In a criminal case, the lawyer shall abide by the client's decision, *after consultation with the lawyer,* as to a plea to be entered, whether to waive jury trial and *whether the client will testify.*

(Emphasis added.) Therefore, our decision places no greater responsibility on defense counsel than is already required by the ethical standards of the legal profession.

■ Because it is primarily the responsibility of defense counsel to advise the defendant of his right to testify and thereby to ensure that the right is protected, we believe the appropriate vehicle for claims that the defendant's right to testify was violated by defense counsel is a claim of ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

In *Strickland,* the Supreme Court defined two requirements for a claim of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to

deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687, 104 S.Ct. at 2064.

The first prong of this test requires that defendant show that counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2065. Where the defendant claims a violation of his right to testify by defense counsel, the essence of the claim is that the action or inaction of the attorney deprived the defendant of the ability to choose whether or not to testify in his own behalf. In other words, by not protecting the defendant's right to testify, defense counsel's performance fell below the constitutional minimum, thereby violating the first prong of the *Strickland* test. For example, if defense counsel refused to accept the defendant's decision to testify and would not call him to the stand, counsel would have acted unethically to prevent the defendant from exercising his fundamental constitutional right to testify. Alternatively, if defense counsel never informed the defendant of the right to testify, and that the ultimate decision belongs to the defendant, counsel would have neglected the vital professional responsibility of ensuring that the defendant's right to testify is protected and that any waiver of that right is knowing and voluntary. Under such circumstances, defense counsel has not acted " 'within the range of competence demanded of attorneys in criminal cases,' " and the defendant clearly has not received reasonably effective assistance of counsel. *See Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064 (quoting *McMann v. Richardson,* 397 U.S. 759, 770–71, 90 S.Ct. 1441, 1448–49, 25 L.Ed.2d 763 (1970)).

In the case at bar, the district court made specific findings after an evidentiary hearing on this issue.[11] "We defer to the dis-

---

like are guides to determining what is reasonable" representation by an attorney.

**11.** This court will generally entertain claims for ineffective assistance of counsel only on collateral review because such claims usually require factual findings best made in an evidentiary hearing. *See United States v. Arango,* 853 F.2d 818, 823 (11th Cir.1988); *United States v. Souder,* 782 F.2d 1534, 1539–40 (11th Cir.1986).

However, in this case the district court held an evidentiary hearing on Teague's motion for new trial, and we have the benefit of that court's factual findings in this matter. At that hearing, Teague was represented by new defense counsel and both Teague and his trial counsel testified. Under these circumstances, we choose to address the claim for ineffective assistance of counsel at this time.

trict court's findings of fact absent a clearly erroneous determination but apply our own judgment as to whether the conduct determined by these facts constitutes ineffective assistance of counsel." *Wiley v. Wainwright,* 793 F.2d 1190, 1193 (11th Cir. 1986). The district court found that "the evidence fail[ed] to show that the Defendant's will was 'overborne' by his counsel. The Defendant was advised of his right to testify, was advised that he should not exercise that right, and did not protest." Upon review of the record of the evidentiary hearing, we cannot say that these findings of fact are clearly erroneous.

Moreover, although at the time of the evidentiary hearing counsel clearly had misgivings about whether Teague had understood that he was choosing not to testify, a review of ineffective assistance of counsel claims must be made from the perspective of defense counsel, taking into account all circumstances of the case as they were known to counsel *at the time of the representation. Porter v. Wainwright,* 805 F.2d 930 (11th Cir.1986), *cert. denied,* 482 U.S. 918, 107 S.Ct. 3195, 96 L.Ed.2d 682 (1987). Teague's counsel clearly had advised him that it would be unwise and unnecessary for him to testify. At the evidentiary hearing, counsel testified that when she rested the defense case, she believed that Teague had assented or acceded to her recommendation. We find that counsel's performance was not constitutionally deficient. Because the defendant has failed to meet the first prong of *Strickland,* we need not address whether Teague's defense was prejudiced in this case.[12]

## CONCLUSION

In summary, we hold that a criminal defendant has a fundamental constitutional right to testify on his behalf, that this right is personal to the defendant, and that the right cannot be waived by defense counsel. Where the defendant claims that this right

was violated by defense counsel, this claim is properly framed as a claim of ineffective assistance of counsel. For the reasons set forth above, we find that defense counsel was not ineffective in this case, and AFFIRM the judgment of the district court.

EDMONDSON, Circuit Judge, concurring in the result in which COX and BIRCH, Circuit Judges, join:

I concur in the result in this case, but I disagree with much that is said in today's court opinion.

I believe a defendant's right to testify can only be described as a right to be free of unreasonable *governmental* interference with his testifying. *See, e.g., Rock v. Arkansas,* 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (statutory per se rule excluding hypnotically refreshed testimony impermissibly infringes on criminal defendant's right to testify). So, I do not believe that defense counsel can violate the right to testify when the limited nature of that right is correctly understood. No one claims here that the government interfered with Teague when he sought to testify. Therefore, no right-to-testify considerations are present in this case.

On the question of ineffectiveness of counsel, defense counsel can be ineffective in the constitutional sense if counsel does not call the defendant to testify; but I think whether the lawyer is ineffective for declining to call a defendant who wished to testify would turn on the circumstances of each case. For defense counsel to be ineffective, the value of defendant's testimony for the purpose of gaining acquittal (or perhaps a lower sentence) would have to be so great and obvious that no reasonable lawyer, given the facts of the particular case, would have exercised his judgment to exclude defendant's testimony. Considering the imponderables of trials in general, such cases would seem to be rare.[1] And, this case is not among those rare cases.

---

**12.** *But see Nichols v. Butler,* 953 F.2d 1550 (11th Cir.1992).

**1.** A defendant's testifying raises significant legal risks for him. *See United States v. Sharif,* 893 F.2d 1212, 1214 (11th Cir.1990) ("When the de-

fendant elects to testify, he runs the risk that if disbelieved, the trier of fact may conclude that the opposite of his testimony is the truth."); *United States v. Bennett,* 848 F.2d 1134, 1139 (11th Cir.1988) (jury may view defendant's false

The Supreme Court, in dicta, has said things that suggest that my view about the nature of a defendant's right to testify may be incorrect. But, dicta is inherently unreliable for what a court will do once faced with a question squarely and once its best thoughts, along with briefs and oral argument, are focused on the precise issue.

I understand and agree that a defendant must personally decide how he will plead to the charges against him, whether he will waive trial by jury, and whether he will appeal. But these decisions are not about trial tactics; they are materially different. These decisions determine whether there is to be a fight and who will judge the fight's outcome. But, once the client decides that there is to be a fight and that he wishes to be represented by a lawyer, I agree with those judges who say that defense counsel need not defer to the client's desires on how the fight is to be waged. *See United States v. Teague,* 908 F.2d 752, 761 (11th Cir.1990) (Roney, J., dissenting), *rev'd on reh'g,* 953 F.2d 1525 (11th Cir.1992) (en banc); *Wright v. Estelle,* 572 F.2d 1071, 1072 (5th Cir.1978) (Thornberry, Clark, Roney, Gee, & Hill, JJ., specially concurring).

To allow the client the last word on trial tactics, including whether the client will himself testify, is to make the client, in effect, his own lawyer.[2] *See Frank v. Bloom,* 634 F.2d 1245, 1257 (6th Cir.1980). Decisions about which witnesses to call are quintessentially tactical and require a trained advocate's judgment, tempered by his responsibilities—such as, avoiding perjured testimony—as an officer of the court. To allow the client to decide absolutely whether the client will testify is potentially

to nullify all of the lawyer's tactical efforts and to make, in fact, a mockery of the very idea that a defendant received a competent defense by means of the assistance of counsel. Put differently, allowing the client to override counsel's tactical decisions undercuts the adversarial process that the Constitution attempts to protect as the essential ingredient to a fair trial.

In defining a defense lawyer's constitutional duty, today's court relies heavily on ABA ethical guidelines. I worry about this practice. I do not believe that ethical standards define or ought to define (or even to count for much in defining) the constitutional standards that apply to effective assistance of counsel. *See Strickland v. Washington,* 466 U.S. 668, 688–89, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984); *Nix v. Whiteside,* 475 U.S. 157, 165, 106 S.Ct. 988, 993, 89 L.Ed.2d 123 (1986) (breach of ethical standard does not necessarily constitute denial of Sixth Amendment guarantee of assistance of counsel); *see also TEW v. Arky, Freed, Stearns, et al., P.A.,* 655 F.Supp. 1573, 1575 (S.D.Fla. 1987), *aff'd,* 846 F.2d 753 (11th Cir.), *cert. denied,* 488 U.S. 854, 109 S.Ct. 142, 102 L.Ed.2d 114 (1988) (attorney disciplinary rules not designed to be basis for civil liability or create private cause of action); *Miami Int'l Realty Co. v. Paynter,* 841 F.2d 348 (10th Cir.1988) (violation of code of professional responsibility does not constitute negligence per se).

Federal courts are "forever adding new stories to the temple of constitutional law, and the temples have a way of collapsing when one story too many is added." *Douglas v. Jeannette,* 319 U.S. 157, 181, 63 S.Ct.

explanatory statement as substantive evidence proving guilt); *United States v. Eley,* 723 F.2d 1522, 1525 (11th Cir.1984) (same).

**2.** Defendants have the right to represent themselves. But, we know it is rarely wise for one to do so. And elaborate procedural safeguards—to protect not only the defendant but also the criminal trial process—are involved. *See Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975) (court must make defendant aware of dangers of self-representation); *Fitzpatrick v. Wainwright,* 800 F.2d 1057, 1065–67 (11th Cir.1986) (listing eight factors for

determining whether defendant's waiver of counsel/request to proceed pro se is knowing and intelligent); *Horton v. Dugger,* 895 F.2d 714, 716–17 (11th Cir.1990) (defendant must assert right to self-representation in timely manner). *If* the defendant-client did have the last word about testifying, I surmise that like procedures would be applicable whenever the client elected to testify over his counsel's objections. But I have not pursued this line of thought because of my view that a defendant who is represented by counsel does not—under the federal Constitution—have the last word on tactics.

877, 889, 87 L.Ed. 1324 (1943) (Jackson, J., concurring in part and dissenting in part), *quoted in Miranda v. Arizona,* 384 U.S. 436, 526, 86 S.Ct. 1602, 1654–55, 16 L.Ed.2d 694 (1966) (Harlan J., dissenting). Effective assistance of counsel involves the lawyer's help to win an acquittal or lower sentence, that is, "vigorous advocacy of the defendant's cause." *See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. To include other ideas—such as whether the representation complied with ethical guidelines, some of which do not aim at acquittal but serve other purposes—burdens and complicates too much an already complex question of what is effective representation. Even if a defense lawyer's blocking of his client's testimony is unethical (leading perhaps to discipline for the lawyer), the lawyer's representation can still be effective from a constitutional point of view if reasonable lawyers could have believed that defendant's testimony would have significantly lessened defendant's chance for acquittal or a lower sentence.

BIRCH, Circuit Judge, concurring in the result:

I concur in the result in this case and join in the concurring opinion authored by Judge Edmondson.

Without retreating in any manner from the positions stated in Judge Edmondson's concurrence, I believe that another facet of the right-to-testify issue should be discussed. Assuming, *arguendo,* that the criminal defendant's right to testify is indeed fundamental and personal and can be violated by non-governmental actors, the accused should be required to invoke that right for it to attach. Hence, a "waiver" type of analysis is inappropriate on review. The opinions of other circuit courts confronting this issue have employed the latter method of review.[1] In addition to being inappropriate, the approach taken by those

circuits is also inadequate in failing to address the "knowing and intelligent" requirement issue discussed by Judge Clark in his dissent.

The majority's holding, based upon a *Strickland*[2] analysis, would place the criminal defendant in the position of at least cocounsel in those circumstances where his desire to testify conflicts with the judgment of his lawyer. When that situation is presented, I believe that a *Faretta*[3] scenario exists. As a result the trial court should provide the *Faretta* mandated cautionary instructions to the defendant, and the appellate court should judge the fairness of the proceedings using the same rules of review developed in the existing post-*Faretta* jurisprudence.

The rationale for adopting a *Faretta* type of analysis—as opposed to a waiver methodology—is grounded in the similarity of the rights at issue; *both the right of self-representation and the right to testify are "reciprocal" rights.* The co-existing, opposing and, hence, reciprocal right to that of self-representation is the right to counsel. The reciprocal right to the right to testify is the right to remain silent guaranteed by the Fifth Amendment. The jurisprudence with respect to such reciprocal rights recognizes that the more fragile of the reciprocal rights is the preeminent right. In the context of the reciprocal right to counsel, this court has accurately observed that the right to counsel "is preeminent over the right to self-representation because the former attaches automatically and must be waived affirmatively to be lost, while the latter does 'not attach unless and until it [i]s *asserted.'*" *Stano v. Dugger,* 921 F.2d 1125, 1143 (11th Cir. 1991) (en banc) (quoting *Dorman v. Wainwright,* 798 F.2d 1358, 1366 (11th Cir.1986), *cert. denied,* 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 801 (1987)).

---

1. *See United States v. Edwards,* 897 F.2d 445 (9th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 560, 112 L.Ed.2d 567 (1990); *Siciliano v. Vose,* 834 F.2d 29 (1st Cir.1987); *United States v. Bernloehr,* 833 F.2d 749 (8th Cir.1987); *United States v. Systems Architects, Inc.,* 757 F.2d 373 (1st Cir.), *cert. denied,* 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 115 (1985).

2. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

3. *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

A preeminent right is one that is assumed to be currently operative and which may be abandoned by the assertion of the subordinate right. *Id.* Thus, *the subordinate right must be invoked by the individual in order for it to attach.* "Waiver of the right to counsel and invocation of the correlative right to self-representation is no simple matter, however." *Marshall v. Dugger,* 925 F.2d 374, 376 (11th Cir.1991) (requiring a clear and unequivocal assertion of the right to *pro se* representation and a knowing and intelligent election to pursue that right).

The subordinate right need not, and cannot, be waived until it has *attached.* "While the right to counsel is in force until *waived* the right of self-representation does not attach until *asserted.*" *Brown v. Wainwright,* 665 F.2d 607, 610 (Former 5th Cir.1982). However, the invocation of the subordinate right serves as a waiver of the preeminent right. *Stano,* 921 F.2d at 1143. "The right to self-representation entails a waiver of the right to counsel, since a defendant obviously cannot enjoy both rights at trial. Because of the important and well-recognized benefits associated with the right to counsel, it is preeminent in the sense the right attaches unless affirmatively waived." *Brown,* 665 F.2d at 610 (citations omitted). In examining various issues surrounding the right to self-representation, this circuit has had occasion several times to characterize the relationship between *pro se* representation and the right to counsel. Language illuminating the preeminence analysis or capturing the tension between these rights is set forth in several opinions of this court.[4]

4. The following cases from this circuit and the former Fifth Circuit stress the reciprocal nature of the right to counsel and the right to self-representation. The observations made in those cases which follow are no less applicable to the reciprocal right to remain silent (the preeminent right) and the right to testify (the subordinate right).

> *Orazio v. Dugger,* 876 F.2d 1508, 1512 (11th Cir.1989) (emphasis added):
> In order for this right to attach, a defendant must voluntarily elect self-representation, by "knowingly and intelligently" waiving the *reciprocal,* constitutionally protected right to the assistance of counsel.
> *Strozier v. Newsome,* 871 F.2d 995, 997 (11th Cir.1989) (emphasis added):
> Since the Supreme Court announced its decision in *Faretta* there has been *tension between the right to counsel and the right to self-representation. The tension exists because the rights are reciprocal: to assert one necessitates waiver of the other.*
> *Dorman v. Wainwright,* 798 F.2d 1358, 1366 (11th Cir.1986) (citing *Brown,* 665 F.2d at 610) *cert. denied,* 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 801 (1987):
> [T]he right to counsel [i]s preeminent over the right to self-representation. in the sense that the former attache[s] automatically and ha[s] to be affirmatively waived to be lost whereas the latter d[oes] not attach unless and until it is *asserted.*
> *Id.* at 1369 (emphasis added):
> Under the law of this Circuit, it is *much easier to waive one's right to self-representation* than to waive other constitutional rights, such as the right to counsel.

> *Brown v. Wainwright,* 665 F.2d 607, 610 (Former 5th Cir.1982) (en banc) (emphasis added):
> The right of self-representation *entails a waiver* of the right to counsel, since a defendant obviously cannot enjoy both rights at trial. Because of the important and well-recognized benefits associated with the right to counsel, *see e.g., Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), *it is preeminent in the sense the right attaches unless affirmatively waived.*
> *Brown,* 665 F.2d at 610–11:
> While the right to counsel is in force until *waived,* the right to self-representation does not attach until *asserted.*
> \* \* \* \* \* \*
> Unlike the right to counsel, the right of self-representation can be waived by defendant's mere failure to assert it.
> *Id.* at 612 (Hill, J., dissenting) (joined by A.B. Rubin, Kravitch, Randall, Tate, T.A. Clark, J.S. Williams, JJ.) (emphasis added):
> These two constitutional rights are mutually exclusive in their application; they cannot be exercised concurrently. Consequently, there must be some starting point when *one right is considered to be in force,* without any express exercise by a defendant, and the other right is excluded.
> *Chapman v. United States,* 553 F.2d 886, 893 n. 12 (5th Cir.1977) (equating assertion of *pro se* right with waiver of right to counsel):
> Even after the defendant has unequivocally asserted the right to defend pro se, he may waive that right. This represents in part the waiver of a waiver insofar as the defendant waives his right to waive appointed counsel.

Precisely as the right to counsel is preeminent to its reciprocal right to *pro se* representation, the right to remain silent is preeminent to its reciprocal, less fragile right to testify. The right to silence is preeminent in the sense that it is the right that attaches at the time of arrest by means of the *Miranda* warning. The arrested individual is advised of the right to remain silent, and he is warned that anything he says can, and will, be used against him. The Supreme Court has protected that right by holding any prejudicial comment by the prosecutor to be a violation of the defendant's fifth amendment right. *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965); *see Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). This circuit recently applied this prohibition to a defendant's silence after *Miranda* warnings and before trial. *United States v. Gonzalez*, 921 F.2d 1530, 1549 (11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 178, 116 L.Ed.2d 140 (1991). The right to remain silent is preeminent in the sense that it is the continuing and existing right during the pretrial period and the course of a trial.

This circuit has utilized a *Faretta* approach in dealing with the right to remain silent. We found that the defendant had waived his right to remain silent and the consequent protection of a prohibition of prosecutorial comment on that silence, by asserting his right to testify as to the issue of identity. After testifying, the prosecutor was then allowed to remark on the silence of the defendant as to those issues unrelated to identity. *McGahee v. Massey*, 667 F.2d 1357, 1362 (11th Cir.), *cert. denied*, 459 U.S. 943, 103 S.Ct. 255, 74 L.Ed.2d 199 (1982).

The right to remain silent is a preeminent right which exists throughout a trial until interrupted by an assertion of the right to testify. This conclusion is recognized in the Eleventh Circuit Pattern Jury Instruction which states: "The law does not require a Defendant to prove his innocence or produce any evidence at all; and if a Defendant elects not to testify, you should not consider that in any way during your deliberations." Committee on Pattern Jury Instructions, Eleventh Circuit, Pattern Jury Instructions (Criminal Cases) Basic Instruction 2.2 (1985). The law of this circuit requires that this instruction be given if requested. *United States v. Bain*, 596 F.2d 120 (5th Cir.1979) (defendant who does not testify is entitled to instruction that no inference may be drawn from that election).

The *Faretta* decision and subsequent opinions applying its holding clearly establish that the right to self-representation is *qualified* by practical constraints. By analogy, these opinions provide guidance as to how the corresponding rights to remain silent and to testify on one's own behalf can be subjected to practical constraints or deemed abandoned in the actual conduct of trials. "In the interest of minimizing disruptions and maintaining continuity at trial," this circuit has adopted the rule that unless the right to conduct one's defense *pro se* is timely asserted, any election to proceed *pro se* is committed to the discretion of the trial court. *Chapman*, 553 F.2d at 893; *see also Cross v. United States*, 893 F.2d 1287, 1290 (11th Cir.1990). Further, an effective invocation of the right to self-representation is conditioned upon a *"clear* and *unequivocal* declaration of the choice to proceed pro se." *Stano*, 921 F.2d at 1143–44 (emphasis added); *see Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541. Thus, the right to proceed *pro se*, albeit a fundamental and personal constitutional right, becomes a qualified right (that is, not absolute) depending upon the point in time at which the defendant undertakes to invoke that right. Moreover, the right to self-representation is conditional or inchoate in the sense that it remains unattached absent an affirmative invocation of sufficient clarity and certitude. The framework of timeliness and clarity considerations established by *Faretta* and its Eleventh Circuit progeny suggest that the subordinate right to testify—even when it is assigned the fundamental and personal character accorded the subordinate right to self-representation—may be subject to qualifications that acknowledge inevitable conflicts with the

right to remain silent and the practical realities of the trial process.

The settled rule is that the defendant seeking to proceed *pro se* must assert the right to do so prior to the commencement of trial; thereafter, any request to proceed without counsel is committed to the discretion of the trial court. Accordingly, the announcement of the constitutional right to self-representation in *Faretta*—in light of the Court's silence as to the timeliness question in that case—did not in itself preclude consideration of the timing of the invocation of the right. This circuit, therefore, affirmed the trial court's denial of a request to proceed *pro se* entered on the third day of trial in the post-*Faretta* case of *Brown*. *See* 665 F.2d at 611; *see also Cross*, 893 F.2d at 1291 n. 10 (noting that the trial court was within its authority to reject an "eleventh hour" request to proceed *pro se*—i.e., made "moments before the beginning of opening statements"—as untimely). *Compare Stepp v. Estelle*, 524 F.2d 447 (5th Cir.1975) (affirming trial court's discharge of defendant's two court-appointed attorneys upon defendant's request, where the request was made after the beginning of voir dire examination) *with Brown*, 665 F.2d at 611.

In short, relevant decisions indicate that even after *Faretta*, the right to self-representation remains qualified by a timeliness requirement which vests the trial court with discretion to deny an untimely request to proceed *pro se*. This limitation on the exercise of the right to self-representation acknowledges the state's interests in judicial convenience and the risk of disruption, as well as the hazard of too readily facilitating the exercise of a right when such exercise necessarily entails the waiver of another important—and more fragile—right. In *Cross*, we described the constitutional perils surrounding requests to proceed *pro se*, noting that

> [b]ecause self-representation necessarily entails the waiver of the sixth amend-

ment right to counsel, a trial court can commit reversible constitutional error by either improperly granting a request to proceed pro se—and thereby depriving the individual of his right to counsel—or by denying a proper assertion of the right to represent oneself, and thereby violating *Faretta.*

*Cross*, 893 F.2d at 1290. The analogous subordinate nature of the right to testify suggests that this right, too, may be subject to appropriate qualifications consistent with the lessons of *Faretta* and its progeny.

This circuit "require[s] an individual to clearly and unequivocally assert the desire to represent himself." *Cross*, 893 F.2d at 1290. Although the right to self-representation is fundamental and personal, "trial courts are not required to divine when a criminal defendant is proceeding *pro se.*" *Stano*, 921 F.2d at 1143. Rather, the defendant must make an affirmative assertion of the right. In order to assert the right to self-representation under *Faretta*,

> a defendant does not need to recite some talismanic formula hoping to open the eyes and ears of the court to his request. Insofar as the desire to proceed pro se is concerned, petitioner must do no more than state his request, either orally or in writing, unambiguously to the court so that no reasonable person can say that the request was not made.

*Stano*, 921 F.2d at 1143. (emphasis omitted) (citing *Dorman*, 798 F.2d at 1366 (citations omitted)).

While no decision in this circuit recites the particulars that are needed for a request to constitute a clear and unequivocal assertion of the right, the *Stano* opinion explicitly rejects the effectiveness of mere constructive notice to the trial court. *Id.* at 1144. Furthermore, the factually diverse cases arising in this circuit since *Faretta* present examples of factors relevant in cases of actual notice to the court.[5]

---

**5.** A direct and persistent election satisfies the minimum actions required of a defendant. *See, e.g., Cross*, 893 F.2d at 1291 (statement made to the court directly that "I want to be allowed to represent myself through this whole trial" was

sufficiently clear and unambiguous, albeit compromised by subsequent ambiguous statements and probably untimely in any event); *Strozier v. Newsome*, 871 F.2d 995, 998–1000 (11th Cir. 1989) (request directed through counsel to the

Ambiguity in the request for self-representation or a failure to diligently pursue the initial request have been held sufficient grounds for denial of the request, "in recognition of the thin line that a district court must traverse in evaluating demands to proceed *pro se*, and the knowledge that shrewd litigants can exploit this difficult constitutional area by making ambiguous self-representation claims to inject error into the record...." *Cross*, 893 F.2d at 1290.[6] The clear rule that emerges from the cases in this circuit is that the right to proceed *pro se* will be deemed abandoned or unattached unless the defendant affirmatively asserts the right. This is consistent with the right's subordinate character. Because any exercise of the right to self-representation entails a waiver of the preeminent right to counsel, courts must approach a defendant's election to represent himself with caution, discharging counsel only where the defendant's desire is clearly and unequivocally expressed. The subordinate character of the right to testify logically warrants the institution of parallel requirements for that right's exercise.

To conclude as I began, I concur in the result reached by the court today. I do so for the reasons stated by Judge Edmondson in his opinion. But if the majority is correct about the nature of the right to testify, the court's approach on how that right is to be asserted properly is in error for the reasons I have undertaken to explain here.

CLARK, Senior Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that a criminal defendant has a *fundamental* constitutional right to testify on his or her own behalf and that this right is personal to the defendant and cannot be waived by his or her counsel. I do not agree, however, that a claim of ineffective assistance of counsel is the appropriate vehicle for analyzing the alleged violation of this fundamental constitutional right. In analyzing claims involving those constitutional rights that are

court on morning of trial was sufficient, although ambiguity as to knowing and intelligent character of waiver required remand); *Orazio v. Dugger*, 876 F.2d 1508, 1512 (11th Cir.1989) (direct statement to the court at hearing regarding appointed counsel's request for withdrawal is a sufficient assertion, and failure to repeat request after denial and acquiescence in counsel's subsequent representation does not obviate unequivocal nature of original request); *Dorman*, 798 F.2d at 1366–67 (defendant clearly invoked right where he filed motions *pro se*, informed the court by letter of desire of proceed *pro se*, and moved for dismissal of public defender; he did not abandon right merely by ceasing to send letters where he was apparently on the verge of contempt of court for his repeated letters and motions); *Fitzpatrick v. Wainwright*, 800 F.2d 1057, 1064–65 (11th Cir.1986) (defendant clearly asserted right by signing waiver of right to counsel and verbally reiterating his desire before the court); *United States v. Edwards*, 716 F.2d 822, 824 (11th Cir.1983) (motions filed by both the defendant and counsel seeking *pro se* representation sufficiently asserted the right); *Chapman*, 553 F.2d at 888 (two announcements to the court by defendant of his desire for self-representation constituted "unequivocal[ ]" assertion); *Stepp v. Estelle*, 524 F.2d 447, 450 (5th Cir.1975) (defendant's request to see judge followed by conference in chambers concerning self-representation amounted to sufficient assertion of right).

6. *See, e.g., Cross*, 893 F.2d at 1291 (defendant's initial statement that "I want to be allowed to represent myself through this whole trial" was sufficiently clear and unambiguous, but subsequent comments evidenced a desire for hybrid representation, thereby giving rise to ambiguity such that the request did not constitute an election to proceed *pro se* ); *Raulerson v. Wainwright*, 732 F.2d 803, 808–09 (11th Cir.) (although initial letter to the court requesting permission to proceed *pro se*, followed by in-court renewal of the request, was a sufficient invocation of the right, defendant's conduct in walking out of the courtroom during the *Faretta* inquiry rendered the request either equivocal or effectively waived), *cert. denied*, 469 U.S. 966, 105 S.Ct. 366, 83 L.Ed.2d 302 (1984); *Brown*, 665 F.2d at 611 (although defendant's counsel filed a pretrial motion stating that defendant waived his right to counsel, defendant actually waived his right to self-representation by virtue of his cooperation with counsel and failure to reassert the right after counsel informed the court that they had resolved their difficulties and the court denied the motion). *See also Jackson v. James*, 839 F.2d 1513, 1516 (11th Cir.1988) (defendant's election to represent himself, when confronted by the trial court with a choice between self-representation and proceeding with the assistance of an attorney who had moved to withdraw on the morning of defendant's trial, was not an invocation of the right to self-representation).

fundamental and personal, courts have consistently employed the procedural safeguard of an on-the-record waiver. The right to testify should be treated no differently. Accordingly, when a criminal defendant has not testified on his or her own behalf at trial, the trial record should reflect that the defendant's waiver of his or her right to testify was knowing and intelligent. As there is no such on-the-record waiver in this case, I would reverse Teague's conviction. Moreover, even if I were to agree with the majority that the ineffective assistance of counsel analysis is appropriate for this case, I would find that Teague's trial counsel rendered deficient performance in that she prevented Teague from exercising his right to testify and he was prejudiced thereby. Thus, under either the analysis I propose or the analysis employed by the majority, I would hold that Teague's conviction should be reversed and remanded for a new trial.

### I.A.

The majority correctly concludes that the right to testify is among that class of constitutional rights that is fundamental and, therefore, must be personally waived by the defendant. Included in this class of fundamental, personal rights are the right to elect to be represented by counsel, the right to choose to go to trial or plead guilty, and the right to decide to be tried by a jury or a judge.[1] The Supreme Court has never addressed the waiver of the right to testify. It has, however, addressed the waiver of these other fundamental, personal rights. Its treatment of these other rights is instructive.

The Supreme Court's seminal case on waiver of a fundamental constitutional right is *Johnson v. Zerbst*.[2] In that case, the defendant alleged that his conviction was unconstitutional because he had been denied his Sixth Amendment right to counsel. Addressing the state's argument that the defendant had waived this right, the Supreme Court stated:

> It has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence of the loss of fundamental rights.' A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege.

. . . . .

> While an accused may waive the right to counsel, *whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record.*[3]

And in *Carnley v. Cochran*,[4] which also involved the waiver of the right to counsel, the Supreme Court held:

> Presuming waiver from a silent record is impermissible. The record must show, or there must be allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.[5]

Thus, for a criminal conviction to survive a challenge based on denial of the right to counsel, the record must show that the defendant's waiver of this right was knowing and intelligent.

The Supreme Court has treated other fundamental constitutional rights similarly. Even when a criminal defendant is represented by counsel, the Supreme Court has determined that the record must show that the defendant's waiver of a fundamental constitutional right is personal, knowing, and intelligent. The most significant example of this determination is the Supreme

---

1. *See Barker v. Wingo,* 407 U.S. 514, 529, 92 S.Ct. 2182, 2191, 33 L.Ed.2d 101 (1972); *United States v. Joshi,* 896 F.2d 1303, 1307 (11th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 523, 112 L.Ed.2d 534 (1990).

2. *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

3. *Id.* at 464–65, 58 S.Ct. at 1023 (footnotes omitted) (emphasis added).

4. *Carnley v. Cochran,* 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962).

5. *Id.* at 516, 82 S.Ct. at 890.

Court's decision in *Boykin v. Alabama*[6]. In that case, the defendant challenged his conviction, which was based on his guilty plea, on the grounds that the record did not affirmatively show that he had validly waived those constitutional rights necessarily waived by entry of a guilty plea, including the right to go to trial and the right to trial by jury. Noting that "[t]he requirement that the prosecution spread on the record the prerequisites of a valid waiver is no constitutional innovation,"[7] the Court reversed the defendant's conviction, stating:

> We cannot presume a waiver of these ... important federal rights from a silent record.
>
> What is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence. *When the judge discharges that function, he leaves a record adequate for any review that may be later sought* [citations omitted] *and forestalls the spin-off of collateral proceedings that seek to probe murky memories.*[8]

The Supreme Court mandated that trial courts establish *on the record* the valid waiver of those fundamental rights waived during a guilty plea; the Court also noted the practical advantage of its mandate: it forecloses subsequent collateral proceedings.

As these cases demonstrate, the Supreme Court has recognized the need for a trial court to establish *on the record* the valid waiver of those constitutional rights that are fundamental and personal to the defendant. As the Court stated in *Barker v. Wingo:*

> [W]e do not depart from our holdings in other cases concerning the waiver of fundamental rights, in which we have placed the entire responsibility on the prosecution to show that the claimed waiver was knowingly and voluntarily made.[9]

If the record does not establish a valid waiver of the defendant's fundamental constitutional rights, then the prosecution and the trial judge have failed to carry out their charge, and the defendant's conviction must be reversed.

The majority correctly acknowledges that the constitutional right to testify is a fundamental right personal to the defendant. The majority fails, however, to treat this right as fundamental in that it fails to require that the record reflect a valid waiver of the right. Instead, the majority concludes that it is appropriate to apply an ineffective assistance of counsel analysis to claims involving the right to testify. This conclusion is wholly unsupported by Supreme Court authority. The Supreme Court has *not* relied on the ineffective assistance of counsel analysis to protect criminal defendants' fundamental constitutional rights; rather, to protect these critically important rights, the Court has required an on-the-record waiver of fundamental constitutional rights. The fundamental right to testify should be treated no differently. As the commentators have recognized, the ineffective assistance of counsel analysis simply does not adequately protect a defendant's fundamental right to testify:

> Ineffective assistance ... is not a useful appellate recourse for criminal defendants as it puts the onus back on the attorney to establish retrospectively why his or her client did not testify. In view of counsel's imprecise anticipation of client perjury or projection of a winning trial strategy, and the lack of a trial record on the issue, the ineffective assistance standard fails to address whether the defendant's desire to testify was overridden by counsel's decision that he

---

6. *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

7. *Id.* at 242, 89 S.Ct. at 1712.

8. *Id.* at 243–44, 89 S.Ct. at 1712–13 (footnotes omitted) (emphasis added).

9. *Barker v. Wingo*, 407 U.S. at 529, 92 S.Ct. at 2191.

or she should not testify. The defendant may be deprived of the right to testify by counsel who otherwise provided effective assistance.

. . .

Given the wide range of 'reasonably effective' assistance and the virtually insurmountable 'but for' test, the *Strickland*[10] standard rarely yields favorable results for defendants restrained from testifying at trial. Moreover, the *Strickland* analysis disregards the personal nature of the right to testify and fails to acknowledge that it is the defendant's decision whether to take the stand.[11]

The majority attempts to have it both ways: it acknowledges that the right to testify is a fundamental constitutional right personal to the defendant, but it refuses to treat it as such. Rather than applying the ineffective assistance of counsel analysis to such claims, this court should do as the Supreme Court has done in analogous situations involving other fundamental constitutional rights: it should mandate that trial courts establish on the trial record the valid waiver of a defendant's fundamental constitutional right to testify.

Not only is this conclusion constitutionally mandated by the fundamental nature of the right to testify, but it also has the practical advantage of "forestall[ing] the spin-off of collateral proceedings."[12] One of our obligations as an appellate court is to prevent unnecessary future litigation. With this case, this court had the opportunity to discharge this obligation by averting collateral claims based on alleged violations of the right to testify. As one commentator has recognized:

[O]n-the-record procedures not only ensure the effective waiver of defendants' fundamental constitutional rights, but also prevent post-conviction attorney-client disputes and facilitate appellate review.[13]

The certainty provided by an on-the-record waiver of a defendant's right to testify would foreclose a later claim by that defendant that counsel failed to advise of the right to testify or declined to allow the defendant to make the choice as to whether to testify. Unfortunately, the majority's opinion does not provide for such certainty; rather, it opens the door for an after-the-fact swearing contest between the defendant and counsel as to whether the defendant validly waived the right to testify.

Accordingly, I would hold that a criminal defendant's waiver of his fundamental constitutional right to testify is not valid unless the trial record affirmatively shows that the defendant knew of this right and personally and intelligently waived the right. I would not proscribe a specific procedure for this on-the-record waiver. The state and federal trial courts are undoubtedly anxious to forestall collateral claims based on the denial of the right to testify. I would, therefore, leave it to these courts to fashion a procedure that ensures that the trial record reflects the defendant's valid waiver of this right. The procedure may entail a colloquy between the trial judge and the defendant[14], a colloquy between defense counsel and the de-

**10.** *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**11.** Majorie L. Rifkin, *The Criminal Defendant's Right to Testify: The Right to Be Seen But Not Heard,* 21 Colum.Hum.Rts.L.Rev. 253, 273–74 (1989); *see also* Seth Dawson, Note, *Due Process v. Defense Counsel's Unilateral Waiver of the Defendant's Right To Testify,* 3 Hastings Const. L.Q. 517, 532 (1976).

**12.** *Boykin v. Alabama,* 395 U.S. at 244, 89 S.Ct. at 1713.

**13.** Rifkin, *supra* note 11, at 265.

**14.** *See Hollenbeck v. Estelle,* 672 F.2d 451, 452–53 (5th Cir.) (noting that state trial judge's colloquy with defendant regarding waiver of right to testify was "a model of appropriate judicial concern for the constitutional rights of a criminal defendant"), *cert. denied,* 459 U.S. 1019, 103 S.Ct. 383, 74 L.Ed.2d 514 (1982). The majority expresses concern over requiring the trial court to discuss the right to testify with the defendant because such a requirement "would unnecessarily intrude into the attorney-client relationship and could unintentionally influence the defendant in his or her choice." Majority opinion at 1533 n. 8. This concern may be allayed by carefully drafting the colloquy between the trial judge and the defendant or by employing one of the other on-the-record waiver procedures mentioned above.

fendant in the presence of the trial judge [15], a statement by defense counsel in the presence of the trial judge and an acknowledgement by the defendant that the statement is accurate, or a written waiver signed by the defendant and filed with the trial court. Whatever the procedure, it is sufficient if the trial record reflects (1) that defense counsel advised the defendant of his or her constitutional right to testify and (2) that the defendant personally and intelligently made the choice not to testify.

### B.

This case amply illustrates the problem with adjudicating a claim based upon an alleged violation of the right to testify when the trial record is silent as to the defendant's waiver of this right. Here, the post-trial evidentiary hearing was held less than ten weeks after Teague's trial; this period of time is far shorter than the time between trial and subsequent collateral proceedings in the typical criminal case. Nevertheless, at the post-trial evidentiary hearing in this case, Teague's defense counsel could not clearly recall the events critical to the resolution of the factual issues underlying Teague's right to testify claim. For example, counsel initially testified that she had a conversation with Teague regarding his testifying shortly before she rested the case for the defense and that she felt he had assented to her decision not to put him on the stand.[16] After reviewing the trial transcript, however, counsel corrected her testimony, deciding that her conversation with Teague occurred *after* she rested the case for the defense, not before; she then testified unequivocally that she "didn't consult [Teague] at all" regarding whether he should testify.[17] I conclude that counsel's testimony demonstrates that she failed to discharge her obligation to advice Teague of his right to

testify and to solicit from him his *personal* decision as to whether to testify.[18] Counsel's testimony is sufficiently ambiguous, however, that my colleagues do not agree. This case, then, demonstrates the need for an on-the-record waiver of a criminal defendant's right to testify. Because there is no such on-the-record waiver in this case, I would reverse Teague's conviction and remand the case for a new trial.

### II.

Even if I were to agree with the majority that a claim of ineffective assistance of counsel is the appropriate vehicle for analyzing the alleged violation of the right to testify, I would conclude that Teague's conviction must be reversed. In reaching its conclusion that counsel's performance was not deficient, the majority relies heavily on counsel's testimony at the post-trial hearing that, "when she rested the defense case, she believed that Teague had assented or acceded to her recommendation" not to put him on the stand.[19] Reliance on this testimony is inappropriate for two reasons. First, counsel gave this testimony before she realized that her conversation with Teague regarding his testifying occurred after, not before, she rested the defense case. Accordingly, this testimony was based on counsel's erroneous perception of the chronology of the events; after counsel corrected her perception, she testified that she "didn't consult [Teague] at all" as to whether he should testify.[20] Second, a fair reading of counsel's entire testimony reveals that any conclusion on her part that Teague intelligently and voluntarily assented to her decision not to put him on the stand was unreasonable.

Three days after Teague was convicted, his trial counsel filed a motion for new trial. She represented that Teague had been "denied his constitutional right to tes-

---

**15.** *See* Timothy P. O'Neill, *Vindicating the Defendant's Constitutional Right to Testify at Criminal Trial: The Need for an On-the-Record Waiver,* 51 U.Pitt.L.Rev. 809, 836–38 (1990).

**16.** R3–19.

**17.** R3–21.

**18.** *See* Part II of this dissent. The pertinent portion of counsel's direct testimony is set out in the appendix to this dissent.

**19.** Majority opinion at 1535. *See* R3–19.

**20.** R3–21.

tify in his own behalf by the actions of his trial attorney." Two months later, at the post-trial evidentiary hearing on the motion for new trial, counsel testified that she "probably did" inform Teague the week before trial that the ultimate decision as to whether to testify was his to make.[21] Counsel further testified, however, that she told Teague that they would postpone the decision as to whether he would testify until the trial.

During the course of the trial, Teague repeatedly asked counsel when he would testify. Notwithstanding these repeated requests, counsel had only one conversation with Teague during the trial regarding his testifying, and this conversation was initiated not be counsel, but by Teague. Counsel's testimony makes clear that, during the course of this one conversation, she did *not* solicit Teague's personal decision whether to testify:

It wasn't as though I took him out, sat down and discussed it with him. I was pretty much—my belief was—I mean, my opinion was he didn't need to and shouldn't [testify], and I certainly made that clear to him. I don't know—*I'm sure I didn't solicit from him are you satisfied with this, or do you want to discuss this any further.* I kind of just stated what I thought he should do.

. . . . .

I never asked him whether—well, one thing I feel confident about at this point that I did not do was remind him it was ultimately his decision. I feel that I probably did that in the meeting that we had in my office the week before the trial started, but at that point during the trial, I don't think I ever reaffirmed that to him or reminded him that I wasn't making that decision. He was. I think he kind of was letting me know that he was willing, and *I was just deciding—telling him very forcefully,* you know, you don't need to do that.[22]

Counsel initially testified that this conversation with Teague occurred before she rested the defense case; while under this mistaken impression, she testified as follows:

Q. Ms. Kearns, if the decision was made, did you feel that Mr. Teague had assented to your decision not to put him on the stand?

A. I'm sorry. At what point?

Q. I guess at the point before you rested, did you believe that Mr. Teague had assented to or acceded to your position?

A. Yes, at that point. Not before the trial started. I mean, I had clearly left it open for further discussion when the trial had started.[23]

It is upon this testimony that the majority bases its conclusion that counsel's performance was not deficient. The majority conveniently ignores, however, that counsel changed her view of the events after correcting her mistaken impression as to when her conversation with Teague took place. During the course of her testimony, counsel discovered that this conversation could not have occurred before she rested the defense case because there was no recess in the trial proceedings at that time. Upon this discovery, counsel testified:

THE WITNESS: Your honor, if there was no recess after Mr. Patterson testified and the time I rested, then the discussion that I had with Mr. Teague was after I had rested, and *I obviously didn't consult him at all.*[24]

Thus, counsel unequivocally admitted that *she did not consult Teague* before *she* made the final decision that he would not testify.

There is further evidence that counsel, not Teague, made the ultimate decision that he would not testify. Counsel testified that, even after the trial was over, Teague continued to ask her when he would testify:

He started calling me. He called me several times at home late, obviously

---

**21.** R3–18.

**22.** R3–16, R3–18 (emphasis added).

**23.** R3–19.

**24.** R3–21 (emphasis added).

very distressed, and his first question to me was, "When do I get to tell my side of the story?"

. . . . .

[I]t was then that I started looking back on it and became concerned that I may not have made clear to him that it was his choice, and that this was something that he could decide to do or not decide to do.... [25]

Counsel's testimony indicates that she did not allow Teague to make the ultimate decision as to whether he would testify; rather, she imposed upon him her decision that he would not testify. Accordingly, I would hold that the district court's conclusion that Teague's will was not "overborne" by counsel is clearly erroneous and that counsel's performance was constitutionally deficient.

I would further hold that Teague can demonstrate prejudice resulting from counsel's deficient performance. This was a close case. The government's case against Teague was based entirely upon the undercover agent's perception of Teague during the few moments immediately before his arrest. The agent concluded that Teague intended to participate in the crime; Teague could have testified otherwise. Teague had no prior convictions, and counsel admitted that, had Teague testified, he would have "come across as truthful, open, and sincere." [26] Under these circumstances, counsel's error in declining to allow Teague to exercise his right to testify was "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." [27] Accordingly, even if I were to agree with the majority that the ineffective assistance of counsel analysis is appropriate for this case, I would reverse Teague's conviction and remand this case for a new trial.

## APPENDIX

Excerpt from the direct testimony of Teague's trial counsel, given during the February 3, 1989 post-trial hearing:

[By Mr. Morrison]

Q. Now, do you remember in your final meeting with him anything specific about what you told him about testifying, or what he asked you about it?

A: Well, what we basically did during the meeting was go through a mock direct and cross-examination, and I also updated him on his witnesses, but that was what we did, and I'm confident that at the end of that my advice to Mr. Teague was that he shouldn't be testifying, but we weren't going to decide that right then.

Q: When you told him that it was your advice that he wouldn't be testifying, did he seem a little bit concerned about that position?

A: Yes, because there was another aspect to this, and that was Kenny Patterson. Kenny Patterson had assured Mr. Teague that he would be testifying and exonerating Mr. Teague. I was not getting that impression from Glenn Zell who represented Mr. Patterson.

So, I kept—I kept telling Mr. Teague we would deal with that when we knew exactly what Mr. Patterson was going to do, although to some extent I think it was my way of appeasing Mr. Teague because my firm belief was he shouldn't testify.

Q. Now, at the trial itself, did Mr. Teague make it known to you his desire to tell his story or to testify or whatever, however, you want to describe it?

A. During the trial, there were a couple times when he asked me was he going to be testifying, or am I going to tell my side, and I at that point knew Mr. Patterson would be testifying, and I said, why don't we wait and see how the evidence develops?

During Mr. Patterson's testimony, he started—there were several times when Mr. Teague was literally pulling on my sleeve saying, "That's not true. That's not true," and I said, "We will talk about it when he gets off the stand."

25. R3–26 through R3–27.

26. R3–19.

27. *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. at 2064.

He asked me again sometime during the defense case whether he was going—when he was going to get to tell his side of it, and I said, "What do you want to tell? What do you think you need to tell?"

And one of his big concerns was what Mr. Patterson had testified to concerning the gun, because Mr. Teague felt strongly—not felt strongly—he was adamant that Agent Augustine had told the truth about the gun and when the gun was removed from the bag whereas Mr. Patterson had changed that when he testified, and I said to Mr. Teague something like if that's what your concern is, don't worry about it because I don't think that is a significant fact.

THE COURT: Would you refresh my recollection about the discrepancy in the testimony at trial? I'm vague about it at this point.

THE WITNESS: Agent Augustine had testified that when he went up to the cab of the truck with Mr. Patterson, that there was a bag, and that when he looked in—he was shown the bag, and he is allowed to glance in the bag, and when he looked into the bag, there was a gun in the bag, and at some point Mr. Patterson removed the gun and put it on the seat of the car between the passenger and the driver's side, and that is where it stayed.

Mr. Patterson testified that he had removed the gun at the bake shop, placed it on top of the bag, and that when he came to the scene of the transaction, that the gun was already outside on top of the bag, and Mr. Teague had told me all along that the gun was inside the bag, and he had not seen the gun until after Augustine had come to the cab of the truck and taken the gun out, and I told Mr. Teague I just didn't think that was significant and, therefore, if that was what he was feeling so strongly about, he didn't need to testify.

Q. Now, did Mr. Teague make any response to what you relayed to him as your feeling about the necessity of his testimony?

A. I think he probably said something like well, if I should, I will, or I'm willing to do it. I'll do it, and I said you don't need to, something like that, and I know we had the conversation here in the courtroom. It wasn't as though I took him out, sat down and discussed it with him. I was pretty much—my belief was—I mean, my opinion was he didn't need to and shouldn't, and I certainly made that clear to him. I don't know—I'm sure I didn't solicit from him are you satisfied with this, or do you want to discuss this any further. I kind of just stated what I thought he should do.

THE COURT: Can you try to recall what words were spoken in that conversation? This was like at a break?

THE WITNESS: It would have been during a break, and it would have been the beginning of the break because I know Mr. Teague was still sitting down, and he brought it up to me, "Well, am I going to testify?"

THE COURT: And this was during the defense case?

THE WITNESS: This was during the defense case. It was after Mr. Patterson testified. I don't recall—I looked at my notes, and my trial notes are by page, and the pages are out of order, so I don't know when Mr. Patterson testified, whether it was before or after our character witnesses, but by—

MR. MORRISON: If I might interject to refresh everyone's recollection, Mr. Patterson was the last witness to testify.

THE WITNESS: I might be wrong about this, but then I would assume that there was a break before I had to rest because it seems to me that there was a break, and Mr. Teague is sitting down and I was standing up to leave, and Mr. Teague kind of said to me, "Well, am I going to testify?"

And that's when I said, "What do you feel you need to testify about?

And he was very concerned about the testimony regarding the gun because that was, of course, the only new devel-

opment. There was nothing else really that was not—that was that new to us about what Mr. Patterson had said, and I said, "Well, Mr. Augustine has already testified about that. They are going to believe Augustine over Patterson on that. Don't worry about that. You don't need to testify."

And I'm sure he said something like well, I will, or I will if it will help, or I'm ready and willing to do it. He told me many times that he was not afraid to testify and he was willing to testify, and I was probably walking out and said, "Don't worry about it, Donald. You don't have to," but I didn't solicit from him. I never asked him whether—well, one thing I feel confident about at this point that I did not do was remind him it was ultimately his decision. I feel that I probably did that in the meeting that we had in my office the week before the trial started, but at that point during the trial, I don't think I ever reaffirmed that to him or reminded him that I wasn't making that decision. He was. I think he kind of was letting me know that he was willing, and I was just deciding—telling him very forcefully, you know, you don't need to do that.

THE COURT: Could you expand a little bit? You said there were demeanor considerations. Be more specific.

THE WITNESS: We went through direct and a cross-examination in my office, and Mr. Teague was very scared because—I mean, he was protesting and he was very scared about what he was facing, not the time in prison but the conviction, the fact of a felony conviction, so when I would ask him questions, he would not listen to the entire question. He would start to cut me off and respond to what he thought I was asking him, and my fear was particularly on cross-examination if he kept jumping the gun, that Mr. O'Leary would be asking a question and he would give a response to the wrong thing, and that he, in fact, could be twisted around that way and essentially make admissions that probably weren't even true because he wasn't listening to what was being said and, you know, he had difficulty maintaining his composure. He cried quite a bit during my asking him questions and, you know, that emotion that he had I thought prevented him from listening to what was going on and prevented him from responding intelligently.

THE COURT: How did you think he would come across in terms of would he seem open, direct? Was there a risk he would seem evasive?

THE WITNESS: No, no. I think he would have come across as truthful, open, and very sincere.

[By MR. MORRISON]

Q. Ms. Kearns, If the decision was made, did you feel that Mr. Teague had assented to your decision not to put him on the stand?

A. I'm sorry. At what point?

Q. I guess at the point before you rested, did you believe that Mr. Teague had assented to or acceded to your position?

A. Yes, at that point. Not before the trial started. I mean, I had clearly left it open for further discussion when the trial had started.

Q. Now, do you remember at the end of the trial whether or not you stated in open court in the presence of Mr. Teague to the court that Mr. Teague would not be testifying?

A. I don't recall that.

Q. So, Mr. Teague never had an opportunity to hear you take that position with the court and then object to it?

A. To my knowledge, he didn't.

THE COURT: Was there a point—I'm just trying to think back—where perhaps out of the jury's presence there was some statement about he might or might not be called?

THE WITNESS: I don't remember that. I don't remember—if there was a break after Mr. Patterson's testimony, I don't remember why there was a break, or whether there was just, you know, the court said this is a good point to recess and nothing was said by us. I just remember that we discussed it during the recess, and if Mr. Patterson was the last

witness, there had to be a recess right on the heels of that.

MR. MORRISON: That's correct, the day ended. That was the end of the day after Patterson testified. There was some discussion about the charges, and I'm not sure if there was a charge conference, but they came back the next day for the closing and the charge, and then the jury deliberated and rendered a verdict.

THE WITNESS: Was there a recess before the charge conference or before I rested?

MR. MORRISON: I believe there was a brief recess before the charge conference. It is in the record, and I can refer to that, but there was a complete overnight recess between the time—there is no—in the transcript there is not any portion in it where it says I rest, but as we often do in trial, you just stop and go into the charge conference.

THE WITNESS: I would have thought the court would have asked, "Are there any further witnesses?"

MR. O'LEARY: I'm not finding such a recess.

MR. MORRISON: Your honor, we are looking at page 113 of the transcript, and there does not appear to have been any appreciable recess or any recess at all after the jury was excused. Ms. Kearns moved again on Rule 29, and it was denied, and then there appears to be a brief charge conference, and then there was a recess overnight.

THE WITNESS: Your honor, if there was no recess after Mr. Patterson testified and the time I rested, then the discussion that I had with Mr. Teague was after I had rested, and I obviously didn't consult him at all.