# CIRCUIT COURT OF AUGUSTA COUNTY

Steven Stuart Marks

v.

Harold W. Clarke,
Director,
Department of Corrections

March 26, 2014

Case No. CL12000307-00

BY JUDGE VICTOR V. LUDWIG

This matter is before the Court on the Petition for *Habeas Corpus* filed by Steven Stuart Marks, on the Commonwealth's Motion to Dismiss, and on Marks' response to the Motion.

At a trial on October 2, 2009, a jury found Marks guilty of three counts of aggravated sexual battery in violation of Va. Code Ann. § 18.2-67.3, and, at a hearing on February 25, 2010 (memorialized by an order entered on February 26, 2010), the Court, consistent with the jury's recommendation, sentenced Marks to six years on each of the violations, to run consecutively, and suspended three years of the eighteen year sentence. Marks appealed his convictions, and, by order of August 25, 2010, one judge of the Court of Appeals·denied the petition, a decision which was affirmed by a panel by order of October 26, 2010. Marks then timely filed the Petition that initiated this action.

This matter last appeared on this Court's docket on May 20, 2013, at which time neither counsel appeared in person, but a staff member of Mr. Hargett's office and the Commonwealth were available by telephone. Mr. Hargett had put the matter on the docket for the scheduling of an evidentiary hearing, but the Court informed the parties that it needed first to consider proceeding pursuant to Va. Code Ann. § 8.01-654(B)(4) ("In the event the

allegations of illegality of the petitioner's detention can be fully determined on the basis of recorded matters, the court may make its determination whether such writ should issue on the basis of the record.") and declined at that time to set the matter for hearing. Although I expected some additional movement by the parties, I take full responsibility for the delay in bringing this matter to a conclusion because it was my decision not to act when Mr. Hargett first requested that I schedule a hearing.

After careful review of the pleadings filed in this *habeas* case and of the record of the underlying criminal case, the Court concludes that the Petition is without merit and that no plenary hearing is required. Accordingly, the Court will enter an order granting the Motion.

Without attempting to summarize all of the evidence offered in the underlying case, suffice it to say that, taken in the light most favorable to the Commonwealth (and untainted by any of Marks' claims), there was clearly evidence sufficient for the jury to find Marks guilty of the crimes with which he was charged.

Marks asserts one claim of trial error, three claims of ineffective counsel, and, finally, a generic cumulative claim, which is an aggregation of the claims.

## I. *Claim Asserting Trial Errors*

With respect to this category of claims, I cannot more succinctly articulate the state of the law than by citing Judge Klein in *Bonhom v. Angelone*, 58 Va. Cir. 358 (2002):

> The purpose of a writ of *habeas corpus* is to examine alleged jurisdictional defects that could establish the absence of legal authority to incarcerate a *habeas* petitioner. *Brooks v. Peyton*, 210 Va. 318, 321 (1969). "The court in which a writ is sought examines only the power and authority of the court to act, not the correctness of its conclusions, and the petition for a writ may not be used as a substitute for an appeal or writ of error." *Id.* at 321 (citing *Council v. Smyth*, 201 Va. 135, 139-40 [1959]). Except for challenges to the trial court's jurisdiction, no claim will be considered in a *habeas* petition if the petitioner had a full and fair opportunity to raise and have the claim adjudicated at trial or on appeal and failed to do so. *See Slayton v. Parrigan*, 215 Va. 27, 29 (1974), cert. denied, 419 U.S. 1108 (1975); *Pettus v. Peyton*, 207 Va. 906, 911 (1967); *Smyth v. Bunch*, 202 Va. 126, 131-32 (1960); *Willoughby v. Smyth*, 194 Va. 267, 272 (1952). Nor does a *habeas* proceeding present a petitioner a second opportunity to argue that the trial court committed error in the underlying criminal proceedings. *Council v. Smyth*, 201 Va. at 140.

*Id.* at 361-62.

Marks' claim of a trial error, like all *habeas* petitions alleging trial error, must be considered in the light of those principles. As to the sole claim of trial error, Ground D, Marks asserts that the evidence was insufficient "to support the convictions," Petition at 20, and that is an assertion of trial error. It does not affect the jurisdiction of the Court to act, and Marks had a full and fair opportunity to raise the issue. Moreover, sufficiency of the evidence is not a matter that is cognizable on a *habeas* petition. "It is well settled that [the issue of sufficiency of the evidence] must be asserted in a direct appeal from, or writ of error to, the original judgment and cannot be made by a collateral attack on that judgment in a habeas corpus proceeding." *Pettus v. Peyton*, 207 Va. at 911. It is procedurally defaulted (or, as the Court in *Slayton* opined, Marks does not have standing to raise the issue).

## II. *Claims Asserting Ineffective Counsel*

Dana Cormier represented Marks at the trial of this case. He is a thoroughly capable and very experienced defense attorney, who has practiced before this Court for a considerable time. He, perhaps more frequently than any other attorney in the area, defends those accused of sex crimes, both at the trial level and on appeal.

Marks' claims of ineffective counsel are governed by the holding in *Strickland v. Washington*, 466 U.S. 668 (1984). A *habeas* petitioner claiming ineffective assistance of counsel must establish both that his attorney's conduct was deficient and that the petitioner was actually prejudiced by his attorney's representation. "Unless [the petitioner] establishes both prongs of the two-part test, his claims of ineffective assistance of counsel must fail." *Jerman v. Director of the Dept. of Corrections*, 267 Va. 432, 438 (2004); *see also Bell v. Cone*, 535 U.S. 685, 695 (2002).

To establish deficient performance, the test is stringent indeed. It requires a showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Counsel's representation must fall below an objective standard, "the proper measure of [which] remains simply reasonableness under prevailing professional norms." *Id.* at 688. "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between the defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).

Having determined that the standard is objective and having articulated the proper measure of assessing defense counsel's conduct, the Court in *Strickland* offered guidance in how to apply those principles. In assessing the quality of defense counsel's representation, "[j]udicial scrutiny of counsel's performance must be highly deferential" when an attorney's

performance has been attacked as constitutionally ineffective. *Strickland*, 466 U.S. at 689. The Court then offered the following cautions when gauging counsel's trial performance to determine if it was ineffective:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id.* (citation omitted).

In addition to establishing the ineffectiveness of counsel, a *habeas* petitioner must also affirmatively prove that he was actually prejudiced as a result of counsel's conduct. That does not require a showing that "counsel's deficient conduct more likely than not altered the outcome of the case," *id.* at 693, but actual prejudice is shown by evidence "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Finally, while the petitioner must prove both prongs of *Strickland* in order to prevail, it is not necessary in every instance for the Court to examine or determine the sufficiency of the evidence on both. On the contrary, the Court need not determine the extent of counsel's deficiency before determining if the defendant was prejudiced. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* at 697.

Marks' claims, like all *habeas* petitions alleging ineffective assistance of counsel, must be considered in the light of those principles. Addressing each of these claims.

## A. *Ground A*

Marks asserts that counsel was ineffective in that he failed to recognize the weakness of the testimony by the victim, Madison, regarding Marks' having assisted her to masturbate himself and that counsel then helped the Commonwealth's case by asking a question that established that element of the crime.

I note that Ground A appears to refer only to one charge, specifically "the allegation involving masturbation," Petition at 7, hence, Marks' focus on his assertion that "the evidence did not establish that she actually touched [his] penis." *Id.* My conclusion about Marks' focus is reinforced by his comment

that, had counsel acted differently, "there is a reasonable probability that *the* charge would have been struck or the jury would have voted for an acquittal on *this* charge." *Id.* (emphasis added).

Marks further argues that, because an element of the crime was lacking, specifically, that Madison "did not claim that she actually touched [Marks'] penis," Petition at 9, counsel was ineffective because he did not move to strike the count and, failing that, did not argue to the jury that the evidence did not support the charge.

Not to put too fine a point on it, the claim is wholly meritless, in part, because the premise is wrong; Madison's testimony regarding that particular incident was not weak. On the contrary, during her testimony describing the act of Marks' masturbation, the Commonwealth instructed Madison to "show the judge and jury how he had your hand," and she did so. That Marks was at least causing or assisting Madison is implicit in the response of the child to the Commonwealth's Attorney's instruction, that response being a hand motion. There is no video record of Madison's demonstrative response, but Mr. Cormier's question merely reflected his recognition that the child had indicated the manner in which Marks had directed her hand in the process.

The Court instructed the members of the jury that they could find Marks guilty only if they found, beyond a reasonable doubt, that Marks sexually abused Madison, an element of which being that he "cause[d] or assist[ed] the complaining witness to touch [his] . . . intimate parts. . . ." (Instruction 12.) The evidence offered by Madison's demonstrating a hand motion to the jury satisfied the Commonwealth's burden on that element of the crime. To be sure, the written record does not describe the motion which the child made, but neither do transcripts show responses of a witness when asked to show the jury his scar, or her stitches, or the hand-motion of the accused when he held the knife to the victim's throat. That category of evidence is routinely admitted and considered by juries, even though no appellate court can review it in detail. In *Malbrough v. Commonwealth*, 275 Va. 163, 171 (2008), the Supreme Court of Virginia said:

> There is good reason for the rule that appellate courts must defer to the factual findings of the trial judge in Fourth Amendment cases. The fact patterns in such cases arrive in infinite variety, seldom or never exactly duplicated. Moreover, *they involve consideration of* nuances such as tone of voice, facial expression, *gestures and body language seldom discernable from a printed record.*

(Emphasis added.) Further, I am keenly aware that:

> [A]n essential of the due process guaranteed by the Fourteenth Amendment [is] that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof,

> defined as evidence necessary to *convince a trier of fact* beyond a reasonable doubt of the existence *of every element* of *the offense.*

*Jackson v. Virginia*, 443 U.S. 307, 316 (1979) (emphasis added). To ensure the protection of that constitutional right for a defendant, it is the duty of the trial court, as a gatekeeper (even absent an objection or motion to strike by the defendant), to ensure that there is evidence to support each element of the crime before permitting a charge even to be considered by the jury. "When a principle of law is vital to a defendant in a criminal case, a trial court has an affirmative duty properly to instruct a jury about the matter." *Jimenez v. Commonwealth*, 241 Va. 244, 250 (1991). That duty arises even when "trial counsel neglected to object to the instruction." *Id.* at 248. Although that case deals with an improper instruction, the principle applies with equal force to the Court's obligation to ensure that there is evidence, if believed by the fact-finder, of each element of the crime. In this case, the Court, in giving Instruction 12, manifested its conclusion that there was evidence, if they believed it, on which the jury could rely for a finding of that element of the crime.

Finally, Marks has focused on a single incident (involving masturbation), so, even if he were to prevail on this claim, it would affect only one conviction. However, Marks was not convicted of a single violation of Va. Code Ann. § 18.2-67.3, but of three, and there was no specific indictment that alleged that Marks caused the victim to masturbate him (although that conduct would violate the statute). In addition to that incident, the victim (ten years old at the time of the trial in October 2009) testified that the first incident involved Marks' rubbing her vaginal area around the time of her sixth birthday (in 2005) and that a second incident occurred in January 2007, Tr., vol. 1, at 121-22 and at 134, when Marks put his mouth on her vaginal area. She said that the incidents involving Marks' touching her vaginal area occurred three times a week since she was seven or eight or nine years old, *id.* at 121-22, and the oral touching occurred two times a week, *id.* at 123, or maybe once a week, *id.* at 124. The child did not disclose her allegations of the events until May 2008, when she was eight years old (nearing nine years old), so her comment that incidents had occurred "since" she was nine years old is simply wrong. The jury could have discounted her testimony because of the lack of certainty regarding the timeline, but that was a jury question which it resolved against Marks. The indictments cover periods from "on or about" (a) August 1, 2005, to August 31, 2005 (when the child was six years old), (b) January 1, 2007, to January 14, 2007, and (c) January 22, 2007, to January 31, 2007 (when the child was nearly seven and a half years old). Even if one discounts the masturbation incident (and one need not do so), the jury had evidence sufficient for each of three convictions.

This claim fails both because Marks did not demonstrate that counsel was ineffective under the applicable standard of *Strickland* and because he did not show that he was prejudiced by counsel's actions.

## B. *Ground B*

Marks asserts that counsel was ineffective in that he failed to offer as evidence photographs of the residence in which the crimes occurred. Although, it is sometimes true, as he asserts, that "a picture is worth a thousand words," the failure to produce them cannot lead to the conclusion "that counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Were it otherwise, defendants would shortly be arguing on *habeas* petitions, when photographs were introduced, that they should have been of a larger size or with a matte rather than glossy finish. "The fact that something which might have been done was not done is not in itself enough to warrant overturning a conviction on a petition for habeas corpus." *Brooks*, 210 Va. at 323.

In any event, counsel argued vigorously that the size and layout of the house called into serious question that the events could have occurred unnoticed, as the victim claimed. Even if counsel might have been more effective in presenting that proposition by introducing photographs, Marks has not affirmatively shown "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

This claim fails both because Marks did not demonstrate that counsel was ineffective under the applicable standard of *Strickland* and because he did not show that he was prejudiced by counsel's actions.

## C. *Ground C*

Marks asserts that counsel was ineffective in that he failed to permit Marks "to testify to [certain] facts and requested it specially as his personal and constitutional right to testify in his own defense and present evidence in his favor." Petition at 11. In support of that claim, Marks offered, as part of the Petition, six pages of testimony that he would have offered had counsel permitted it.

Clearly, this claim gives rise to two questions. First, did counsel refuse to permit Marks to testify as he wished and, second, what impact might the testimony that Marks now offers have had on the trial.

With respect to the first question, Marks relies primarily on *United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992), for the proposition that "a criminal defendant has a fundamental constitutional right to testify on his or her own behalf at trial. This right is personal to the defendant and cannot be waived either by the trial court or by defense counsel." Although that case is not binding on this Court, it is a well-reasoned decision, and

it persuasively sets forth the principle, recognized in *dictum*, but never specifically applied by the United States Supreme Court (whose decisions of constitutional magnitude are binding on this Court) in the context of a claim by a defendant that his counsel refused to permit him to testify. *See, e.g., Jones v. Barnes*, 463 U.S. 745, 751 (1983) ("It is also recognized that the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf. . . ."); *Rock v. Arkansas*, 483 U.S. 44, 49 (1987) ("At this point in the development of our adversary system, it cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense.") Given that guidance from the United States Supreme Court, the Commonwealth's observation that Marks' "attorney wisely chose to limit his exposure to contradiction" is not a compelling argument. Assuming counsel made that choice, given the holding in *Teague*, the Commonwealth may simply be wrong in its comment that "[t]hat decision was not ineffectiveness." Motion at 6. On the contrary, to the extent that counsel made the choice to limit Marks' right to testify, it was not counsel's decision to make, except to the extent of restricting the testimony to testimony that was relevant, material, and admissible.

Even recognizing that the right to testify on one's own behalf is a fundamental right and that it is the defendant who makes the decision, that right is not without limits. *Rock*, 483 U.S. at 55. In *Brooks, supra*, Brooks asserted that he was denied the right to testify on his own behalf. In fact, he did testify, although the Court limited him to answering questions prepared by his attorney "after it was apparent that [Brooks] desired to engage in a lengthy discourse of immaterial and irrelevant matters." *Id.* at 323.

In the case at bar, like Brooks, Marks did testify on his own behalf. In that testimony, he described email correspondence between his wife and the victim's mother, his relationship with the victim, his affection for her, his denial of the claims that she had made against him, and the frequency with which he saw the victim after the events giving rise to the charges allegedly occurred. In fact, his testimony in one particular (his denial to the jury that he had told a law enforcement officer that he had masturbated while watching pornography) was partially impeached by an investigator and a video that showed that Marks admitted that he may have masturbated and that the victim might have walked in while he was doing so. As to the testimony which Marks asserts that he was not permitted to offer, I will discuss below whether it, like that proffered by Brooks, was immaterial and irrelevant.

At this point in the proceeding, without the Court's ordering an affidavit from Mr. Cormier either denying or confirming Marks' charge that counsel did not permit him to testify, I will assume the truth of that assertion. Although I am expressly not accepting the truth of that assertion but only working from it, it appears from the holding in *Teague* that Mr. Cormier's preventing Marks from testifying (if he did so) was, *per se*, ineffective counseling.

> Where the defendant claims a violation of his right to testify by defense counsel, the essence of the claim is that the action or inaction of the attorney deprived the defendant of the ability to choose whether or not to testify in his own behalf. In other words, by not protecting the defendant's right to testify, defense counsel's performance fell below the constitutional minimum, thereby violating the first prong of the *Strickland* test. For example, if defense counsel refused to accept the defendant's decision to testify and would not call him to the stand, counsel would have acted unethically to prevent the defendant from exercising his fundamental constitutional right to testify.

*Id.* at 1534.

I note that there is a subtle distinction between *Teague* and *Marks* in that Teague was not allowed to take the stand while Marks was and did. *Teague* does provide some guidance at 1530-31 that indicates that limiting a defendant's testimony to truthful and admissible evidence is acceptable and is neither a violation of a defendant's fundamental right to testify nor ineffective counsel.

However, although it might be ineffective counsel in every instance to deny a defendant his fundamental right to testify truthfully to relevant, material, and admissible evidence, that is not the end of the inquiry. Because *Strickland* prescribes that "the appropriate vehicle for claims that the defendant's right to testify was violated by defense counsel is a claim of ineffective assistance of counsel," *Teague*, 953 F.2d at 1534, it is appropriate to determine, as directed by *Strickland*, whether "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice. . . ." *Strickland*, 466 U.S. at 697. Although a defendant might be prevented from testifying, it is not always the case that his failure to testify prejudices him. On the contrary, it could well be, in many instances, that a defendant, fully exercising her right to testify, could seriously prejudice her case in a way that a defendant, wrongly denied that right, might be spared. Moreover, even on the issue of prejudice, the decision in *Strickland* makes it clear, at least by negative implication, that some level of prejudice is tolerable. It is only when there is "sufficient prejudice" that the conjunction of ineffective counsel and prejudice "so upset[s] the adversarial balance between the defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman, supra*. It is only with that conjunction that *habeas* relief is mandated.

With respect to evidence that Marks maintains is the basis of counsel's ineffectiveness in not permitting him to testify, I have addressed his proffered testimony below in numbered items that correspond to the unnumbered paragraphs of the proffer. I have noted, in each item, whether or not the

proffered testimony would be admissible, and, if so, whether the lack of it would be prejudicial. Marks would have testified about the following.

1. *How It Happened That the Victim and Her Brother Came To Live with Him and His Wife, Susan*

Susan testified to those facts, as well, Tr., vol. 2, at 20 and 22-23, as did Felix, Tr. vol. 1, at 158-59. He is Susan's son and Marks' step-son. Marks' testimony would have added little or nothing, so he cannot claim prejudice.

2. *The Relationship He and Susan Had with Felix and the Children, Kyler and Madison (the Victim) (Collectively, the Children)*

Susan testified to those facts, *id.* at 26–27, as did Felix, Tr., vol. 1 at 166-68, and Elizabeth Shifflett (Elizabeth) (she is Felix's girlfriend), *id.* at 191, and Nicole Rutan (Nicole) (she is Susan's daughter and Marks' step-daughter), Tr., vol. 2, at 4 and 8-9. Marks also testified to his relationship with Madison, *id.* at 47-48, so, with all of that evidence, he cannot claim prejudice.

3. *His Son's Girlfriend Moving in with Them*

Assuming the evidence to be relevant, Susan testified to those facts, *id.* at 23-24, and Marks' testimony would have added little or nothing, so he cannot claim prejudice.

4. *His Work Schedule from 2003 through 2007*

Susan testified to those facts, *id.* at 22, and Marks' testimony would have added little or nothing, so he cannot claim prejudice.

5. *Susan's Work Schedule for the First Two Years That the Children Were with Them and Her Subsequent Decision To Stop Work because of Medical Issues*

Susan testified that she worked for a time after the Children came to live with the Markses, *id.* at 21, and Elizabeth testified that Susan stopped working and "was at the house all the time." Tr., vol. 1, at 192. Marks' testimony would have added little or nothing, so he cannot claim prejudice.

6. *The Reappearance of Shannon Prater (Shannon), the Children's Mother, and the Continuing Good Relationship between Him and the Children*

Felix testified that Shannon reappeared approximately two and a half years after she left the Children with the Markses. *Id.* at 165. Susan also testified to some contact with Shannon, at a time after Shannon left the Children with the Markses. Tr., vol. 2, at 21. This evidence is of so little consequence that Marks cannot claim prejudice.

*7. Shannon's Leaving Again, His Learning That She Was Living in Baltimore with a Man, and That the Children Were Still Doing Well*

*See* item 6.

*8. Shannon's Commencing To Visit the Children, and about Felix's Telling Them that Shannon Had Told Him That She Wanted To Take the Children to Maryland To Live with Her. He Would Also Have Testified about His and Susan's Objection to That Plan but That Shannon Persuaded Them That It Was Best and That Madison, Particularly, Wanted To Go*

Susan testified to Shannon's re-instituting visitation when she "started getting married" and that she was "trying to take them from us." *Id.* at 26. She confirmed that she and Marks objected to the plan, but Madison (actually the Children) "really wanted to go." *Id.* at 27-28. Given that Susan testified to those facts, Marks' testimony would have added little or nothing, so he cannot claim prejudice.

*9. What Susan Told Him Shannon Had Said about the Conditions for Visitation between the Children and Marks and Susan; That the Children Went to Shannon during the Summer of 2007; That All Was Well with His and Susan's Corresponding with and Calling the Children; and about the Children's Visiting during Thanksgiving and Christmas 2007 and over a Cousin's Birthday in 2008*

Susan testified that they had regular contact with the Children after they moved with Shannon to Maryland, including visits at Christmas, Thanksgiving, and trips to the lake. *Id.* at 28. Given that Susan testified to those facts, Marks' testimony would have added little or nothing, so he cannot claim prejudice.

*10. An Attempt by Susan To Schedule an Extended Visit during the Summer and Shannon's Rebuff of That Proposal, Insisting, Instead, on Only Occasional Weekend Visits*

Susan testified that, in April 2007, Shannon told her that they could not have the Children for two weeks during the summer. *Id.* at 28-29. Given that Susan testified to those facts, Marks' testimony would have added little or nothing, so he cannot claim prejudice.

*11. The Reaction of Marks and Susan to Shannon's Response (They Were Infuriated); about Susan's Sending a "Nasty" Email to Shannon; and about Marks' Suggestion to Susan That She Not Do So because It Would Risk Angering Shannon. He Would Also Have Testified about Shannon's Assertion That She Was "in Control Now" and That She Would Make Decisions about What the Children Would Do*

Susan also identified the emails to which Marks referred in his proffer and described their contents and their impact on her and Marks. *Id.* at 29-31. In fact, Marks did testify about the emails, and he described his participation in the process and articulated his concerns. *Id.* at 47. Given that both Marks and Susan testified to those facts, he cannot claim prejudice.

12. *Susan's Reply to Shannon That She Would Initiate Proceedings in Court To Get the Children and about Shannon's Response That She Would Take Felix to Court for Child Support*

Susan testified to her intention to contest custody of the Children in court. *Id.* at 31. Although Susan did not make any reference to Shannon's threat to Felix, Marks' testimony would have added little or nothing to the relevant facts, so he cannot claim prejudice.

13. *A Visit, a Few Weeks Later, from a Representative of Child Protective Services, to Marks' Daughter, "Asking Some Questions and Telling Her Not To Let Her Kids Stay with Anyone Else"*

Susan testified that she learned of the allegations a couple of weeks after the email exchange described in items 11 and 12. *Id.* at 32. Marks' proffered testimony is relevant to the timing of the beginning of the investigative process in relation to the exchange of emails and Susan's testimony serves that purpose. Marks' testimony would have added little or nothing, so he cannot claim prejudice.

14. *A Visit by "an Officer" and a Representative from CPS to Marks' Work Place and about Their Request That He Join Them at the Sheriff's Office, to Which He Agreed. Although Marks Called Susan, She Was Not Permitted To Participate, and the "Investigator Grilled [Marks] for Three Hours, Saying Bad Things, Twisting Things Around, Getting in [His] Face, Hollering at [Him], and [He] Was So Confused and Upset and Crying."*

None of the proffered testimony in this item is relevant to the issue, and Marks' generalities concerning the officer's actions are too vague to give rise to any claim of prejudice. The lack of this testimony was not prejudicial to Marks.

15. *Marks' Fear That He and Susan Would Never See the Children Again and about His Telling Susan That Shannon Was Saying That He Had "Messed with Madison."*

Marks' emotions at a time early in the proceeding and his comments to Susan are not relevant, and the lack of this testimony was not prejudicial to Marks.

16. *The Investigator's Having Told Him That Madison Was Going To Have a Medical Examination within a Couple of Days; That the Tests Would Be*

*Available Shortly; and That He Thought That To Be a Good Thing because It Would Prove That He Was Telling the Truth. Marks Would Also Have Testified about His Learning That Shannon Had Gone to the Police Only a Few Days after "the Emails" and That He and Susan "Knew That Shannon Had Pressured, Coached, [sic] Madison To Say These Ridiculous Things."*

The proffered testimony concerning the investigator's representations to Marks would have been inadmissible as hearsay. His purported knowledge that Shannon had coerced Madison would have been inadmissible as hearsay or speculation. And, as I have noted, Susan testified to the fact that the allegations arose shortly after the emails.

17. *Marks' Perception That "[I]t Did Not Take Shannon Long To Convince Madison To Say These Things;" about His Certainty That "Madison Would Say Anything Her Mother Wanted Her To . . ." and about His Knowledge That Madison Would Not "Have Told These Stories If She Knew Exactly What Would Happen to Me"*

All of this proffered testimony would have been inadmissible as speculation.

18. *Marks' Perception That "Madison Was a Very Strong-Minded Person . . . Sassy and Would Speak Her Mind." He Would Also Have Testified That Madison Was Shy about her Body and Would Not Permit Anyone To See Her Naked, That She Would Never Have Let Marks "Take Her Pants Off without Fighting and Screaming," and That "Someone in the House Would Have Noticed or Heard Such a Thing."*

Marks could have testified about his observations of Madison's personality (although it is difficult to reconcile a strong-minded, sassy person who would speak her mind with the person whom Shannon quickly coerced into "saying anything she wanted her to"), but any prejudice must be considered in light of the fact that Felix testified that Madison was "permitted to argue with [Marks] at length—about whatever she liked. So there was a good bit of that. . . ." Tr., vol. 1, at 166. Moreover, Elizabeth testified that "Madison was in charge, most of the time. . . . Well, she would talk back." *Id.* at 191.

His proffered testimony as to his expectation of Madison's reaction to an act of sexual abuse and his observation about what others in the house would have heard or noticed would have been inadmissible as speculation, and both would be issues for argument, not testimony. Moreover, as I note below, Felix, Elizabeth, and Susan each testified to the unlikelihood that the acts could have occurred as Madison described them without anyone noticing it.

With respect to Marks' testifying that Madison would not permit people to see her naked, because no other witness testified to that discrete allegation, his testimony would have been based on hearsay information from others (if

Susan is to be believed with respect to the long hours he worked) or would be based on Madison's conduct when Marks could observe her (which could give rise to the observation that her total modesty was a consequence solely of Marks' presence, because no one else commented on it). Even if the evidence could give rise to an argument in Marks' favor, the lack of it does not affirmatively show actual prejudice such "that there is a reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

19. *Marks' Hearing Nothing More about the Allegations until November, When an Officer and a Representative of CPS Again Appeared at His Workplace; about the Officer's Insisting That Marks "Did It," and His Insisting That He Had Not*

The lack of this testimony was not prejudicial to Marks.

20. *His Asking about the Medical Tests Performed on Madison; about the Officer's Having Said That There Were No Tests; and about Marks' Disbelief Because That Was "the One Piece of Evidence That Would Prove I Was Telling the Truth"*

This evidence would have been inadmissible hearsay. Moreover, even test results showing no damage to the child would not have had the effect which Marks asserts. First, the nature of the contact which Madison described likely would not have resulted in permanent physical injury, and, second, the passage of time might have diminished any physical evidence that might have existed.

21. *The Fact That Someone in the Sheriff's Office Called Him in January To Tell Him That There Were Papers for Him There; That He Went To Pick Them Up; and That He Was Arrested and Incarcerated*

The process by which he was arrested is irrelevant, and the lack of this testimony was not prejudicial to Marks.

22. *The Fact That Susan and His Mother Bailed Him Out and That He Went To Speak to an Attorney Who "Referred to It As a Set Up." Marks Would Have Testified to His Perception That No One Who Knows Him Thinks He Did It.*

The lack of this testimony concerning who bailed him out is irrelevant, the attorney's comment is hearsay, and Marks' perception of what others think about him is speculation. None of it would have been admissible.

23. *His Description of the Trial*

That is not testimony that he could have offered at trial.

24. *His Not Having an Opportunity To Tell His Side of the Story*

That is Marks' complaint and the basis for the Petition; it is not testimony.

25. *His Disbelief of Madison's Testimony; about Her Mannerisms in Delivering It; and about His Analysis of Her Credibility*

Marks' view of Madison's testimony is the subject of argument, not testimony.

26. *Marks' Having Had Erectile Dysfunction for "the Last Four Years;" about the People Who Were in the Home; and about the Fact That the Children Came Home Together and Were Together after School until They Went to Bed, So Kyler Would Have Known If the Events Which Madison Described Would Have Occurred*

Others testified about the people also living in the home. The only new relevant information which Marks raises which was not addressed by other testimony is his assertion of having erectile dysfunction and the information that the children came home together and remained so until bed time.

With respect to the latter proffered testimony, given Susan's testimony (that Marks' work schedule kept him from home during those hours), either Marks' testimony was hearsay (if Susan was telling the truth, he would not have known what the Children did on their return from school except from what others might have told him), or his testimony would have impeached Susan's testimony which tended to show that there was a very limited time during which the events that Madison described could have occurred.

That leaves his proffered evidence of erectile dysfunction for "the last four years," but I note that the Petition was filed on March 7, 2012, over an affidavit signed by Marks on March 6, 2012. Further, I note that the events which gave rise to the convictions occurred in 2006 and 2007. With that chronology, it is difficult to perceive how Marks' medical condition after March 2008 is of any consequence or how the lack of evidence of his erectile dysfunction after the alleged events could be prejudicial to him.

Even if one ignores the time span as Marks has described it and extends it to cover the period when the events giving rise to the convictions were alleged to have occurred, Marks would have to reconcile his testimony that he had erectile dysfunction (and the inference that he could not have had the victim masturbate him) with two other items of evidence. First, Susan testified that Marks watched pornography, Tr., vol. 3, at 38, and, although he might have done so only as an art form, the jury might have wondered why one with erectile dysfunction would have watched pornography. Second, the jury viewed Marks' admission on the video that he may have masturbated while watching pornography and that Madison might have walked in while he was doing so. To be sure, there was no specific time reference for Susan's comment, but Marks' corroboration of his watching

pornography coupled with his acknowledgement of a mere possibility that he masturbated during the time that the child was at his home indicates that his erectile dysfunction was not entirely debilitating.

27. *Kyler's Not Having Testified*

That is not relevant to a claim that Marks' was not permitted to testify.

28. *Susan's Not Having Worked, Her Having Been at the House All of the Time and about Her Knowing Everything That Went On in the House*

As I noted above, Elizabeth testified that Susan had stopped working and "was at the house all the time." Tr., vol. 1, at 192. Marks' observation that Susan would have known everything that went on at the house would have been speculation and inadmissible, but Susan testified that she would have heard everything that went on in the house. *See* item 27. The lack of Marks' testimony on this issue was not prejudicial to him.

29. *The Details of the Layout of the House and His Belief That What Madison Claimed To Have Happened Was Impossible. Marks Would Also Have Testified That "[A]nyone with Common Sense at All Knows What Madison Said Is Impossible and Unbelievable. She Was Lying, and I Am Sure That Other People Would See It."*

Felix testified to the layout of the house, that he was in the house during the relevant period "every minute of every day" (he had no operator's license or employment), and that there was "no way [the incidents Madison described] could have went undetected." Tr., vol. 1, at 170. Elizabeth also briefly described the layout of the house. *Id.* at 193-94. Susan testified that it was a small house, that if she were in the house, Marks could not have abused Madison in Madison's bedroom, or at the computer, or in the bedroom she shared with Marks, and that she would have heard "everything going on in the house." Tr., vol. 2, at 37-38.

Marks would not have been permitted to testify that anyone with common sense would know that Madison's version of the events was impossible and incredible; sadly for him, twelve people disagreed with that assessment. In addition, Marks' testimony that Madison's testimony was incredible is argumentative and would not have been admissible. He could have testified that she was lying, and he did, by denying that any of the events occurred. *Id.* at 48-51. He could not have testified that "other people would see" that she was lying; again, twelve other people disagreed with that assessment.

30. *Marks Perception of Shannon's Testimony (That She Tried To Make It Appear That Madison Was Tortured) and About What Madison's Reaction Must Have Been If the Allegations Were True. He Would Also Have Testified That Madison Was Always a Happy Child, Not Afraid of Him, That She*

*Willingly Returned To Visit, and That She Did Not Tell Anyone for a Long Time after the Events Were Alleged To Have Occurred*

Marks proffered testimony regarding the first sentence would have been speculation and inadmissible. Also as I have noted, Felix, Elizabeth, and Susan testified to Madison's relationship with Marks, and there was no issue that Madison both visited on occasion after the alleged events occurred or that she waited some time before making the allegations. The lack of Marks' proffered testimony was not prejudicial to him.

31. *The Fact That It Was "Not until a Few Days after the Emails Were Sent That Madison Supposedly Told Her Mother about the Accusations;" That It Was No Coincidence; That It Was a "Set Up"*

As I noted, Susan testified to the timing of the complaints in relation to the timing of the emails, and the balance of Marks' observations are speculation and the subject of argument, not testimony.

32. *Susan's Email to Shannon Being the Cause of the Latter's Using the Allegations To Win Custody of the Children. "She Made This Stuff Up and Went to the Police with the Lies. Anyone Can See This."*

As I have noted, Susan testified to the timing of the emails in relation to the complaints, and the balance of Marks' observations are speculation and the subject of argument, not testimony.

33. *His Assertions That He Would Never Hurt a Child, That He Never Had Any Problems with Children Before, That He Had Babysat for his Cousins, That He Had Gotten Custody of his Son and Raised Him, That He Had Raised Susan's Children as His Own, and That Many Other Children Have Stayed with Him and Susan*

Both Felix, Tr., vol. 1, at 170, and Nicole, Tr., vol. 2, at 2, testified that Marks was always appropriate with them.

34. *That the Relationships Were "Fine until the Threatening Emails Were Sent" and His Expression of Sadness That "Shannon Has Won Again." These Are the Entirely Understandable Comments of a Sorely Disappointed Man, but, Except for the Timing of the Problems with Respect to the Emails* (Which I Have Addressed Above), *None of It Would Be Admissible*

Considering all of the evidence, Marks' has not affirmatively shown that his failure to testify to the facts which would have been admissible created actual prejudice such that, had he testified to them, "there is a reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Assuming that Mr. Cormier did not permit Marks to testify as Marks now maintains he desired to do, this claim nevertheless fails because Marks did not show that he was prejudiced by counsel's actions.

E. *Ground E*

Marks asserts that, on a *habeas* petition, the Court must consider in the aggregate all allegations of deficient performance and, for the proposition, cites federal circuit court opinions and opinions of other states, none of which is binding on this Court.

This claim fails because all of the others have, so an aggregation of meritless claims yields yet another. In this instance, the whole is not greater than the sum of its parts. Marks' general reference to the Court's comments in *Strickland* appearing on pages 694 through 696 is less than helpful for this Court to discern the principle that "[a] decision to grant relief on ineffective assistance grounds is a function of the prejudice flowing from all of counsel's deficient performance." Petition at 25. Marks fails to take into consideration the further observation that the Court was considering an unarticulated aggregate approach if there were instances of ineffective counsel.

> Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.

*Strickland*, 466 U.S. at 695-96. What Marks argues as an aggregation approach approved by *Strickland* assumes that there are errors to aggregate or prejudices to cumulate. Where, as here, there are none, the approach, assuming it to be valid, does not apply. However, both the Fourth Circuit (which is persuasive but not binding on this Court) and the Supreme Court of Virginia (which most certainly is both) have rejected that aggregation approach. *See Mueller v. Angelone*, 181 F.3d 557, 586, n. 22 (4th Cir. 1999); *Fisher v. Angelone*, 163 F.3d 835, 852-53 (4th Cir. 1998); and *Lenz v. Warden of the Sussex I State Prison*, 267 Va. 318, 340 (2004) (subsequent history omitted).

### III. *Summary*

After considering each of Marks' claims and finding all of them to be without merit, the Court grants the Commonwealth's Motion and dismisses the Petition.